## *Ex parte* D. O. McCARTHY.

AID OF COUNSEL TO WITNESS BEFORE LEGISLATURE. — A legislative assembly may refuse to a party summoned before it as a witness the aid of counsel when charged with contempt in not answering questions.

COMMITTEE OF A LEGISLATIVE BODY.—The appointment of a committee by the Senate, with power to investigate charges of bribery made against members of that body, does not preclude the Senate from afterwards summoning the witnesses, and making the investigation before the bar of the Senate.

WHAT CONSTITUTES AN ISSUE WITHIN THE STATUTE AGAINST PERJURY. — When charges of bribery are made by any person against members of either branch of the Legislature, without giving their names, and a resolution is adopted by the branch to which the members accused are said to belong, reciting the charge, and resolving to investigate it, and witnesses are summoned before it, an issue is made up within the meaning of the statute against perjury.

POWER OF A STATE LEGISLATURE. — A State Constitution is not a grant, but restriction upon the powers of the Legislature, and hence, an express enumeration of legislative powers is not an exclusion of others not named, unless accompanied by negative terms.

POWERS AND PRIVILEGES OF A LEGISLATIVE ASSEMBLY.—A legislative assembly has all the powers and privileges which are necessary to the proper exercise, in all respects, of its appropriate functions.

SOURCE OF SAME.—Such powers and privileges are inherent in a legislative body, and are to be ascertained primarily by a reference to the common parliamentary law.

SAME.—A legislative assembly has all the powers and privileges conferred by the common parliamentary law unless restrained by some express provision of the Constitution, or some express law made unto itself.

POWER OF LEGISLATURE TO SUMMON WITNESSES.—By the common parliamentary law a legislative assembly may compel the attendance of all persons within the limits of their constituency, as witnesses, in regard to subjects on which they have power to act, and into which they institute an investigation.

EXAMINATION OF WITNESSES BEFORE LEGISLATIVE ASSEMBLY.—Witnesses before a legislative assembly or its committee are not sworn, unless there is some provision of law or of the Constitution authorizing it, but give their testimony under the penalty of being adjudged guilty of contempt, and punished, if they testify falsely.

MANNER OF COMPELLING WITNESSES TO TESTIFY BEFORE LEGISLATURE.—When witnesses are brought before either branch of the Legislature, they may be compelled to testify by process of contempt, when without legal cause they refuse to do so.

WITNESSES REFUSING TO TESTIFY BEFORE THE LEGISLATURE.—When a charge of bribery is brought against members of the Senate, the Senate has power to investigate the charge, and to summon the person making the charge before its bar as a witness touching the same, and to commit him for contempt for refusing to testify without sufficient legal cause.

THE case was argued before Mr. Chief Justice CURREY, Mr. Justice SAWYER, and Mr. Justice SANDERSON.

The facts are stated in the opinion.

*J. W. Coffroth*, and *J. C. Goods*, for Petitioner.

*J. G. McCullough*, *Attorney-General*, and *N. Greene Curtis*, against his discharge.

Opinion by SANDERSON, J.

In his petition for a writ of *habeas corpus* the petitioner, D. O. McCarthy, substantially states that he is illegally imprisoned and restrained of his liberty by confinement in the County Jail of Sacramento County, under the control of one

James McClatchy, Sheriff of said county; that he is not so imprisoned by virtue of the final judgment or decree of any Court or Judge of the United States or of this State; that he is so confined by virtue of an illegal order or warrant issued by the Senate of the State of California, in a case in which said Senate had no jurisdiction under the Constitution, nor by virtue of any law made in pursuance thereof.

The proceedings which led to the imprisonment of the petitioner, as appears from the return of the Sheriff to the writ and from the Journal of the Senate, which, by mutual consent, was referred to at the hearing, and treated in effect as a part of the return, were instituted under the circumstances and conducted in the manner following:

On the 17th of February, 1866, an article appeared in a newspaper, published at San Francisco, called the *Daily American Flag*, of which the petitioner was the reputed editor and proprietor, charging in effect that seven members of the Senate, not named, had each received the sum of twelve thousand dollars for voting against the repeal of the so called Specific Contract Act; and that the sum of twenty-four thousand dollars had been divided among the members of the lobby as compensation for their services in effecting the arrangement. On the 19th of the same month, the Senate being in session at Sacramento, the Capital of the State, C. B. Porter, Senator from the Counties of Contra Costa and Marin, offered a preamble and resolution, which was subsequently adopted, reciting the article in question, and providing for the appointment of a committee to investigate the charges therein contained, with the usual power to send for persons and papers. On the 21st of February, Senator Ewer, one of the members of the committee so appointed, offered a resolution authorizing the committee to proceed to San Francisco for the purpose of investigating the charges of corruption and bribery aforesaid, and granting them indefinite leave of absence for that purpose. A substitute was offered by Senator Hale, and finally adopted, to the effect that the petitioner be immediately summoned to appear forthwith at the bar of the Senate,

then and there to testify as a witness touching the charges aforesaid. Shortly thereafter the petitioner appeared at the bar of the Senate, and Senators Belden and Heacock were appointed by the Senate as managers to conduct his examination. Without going further into detail, it is sufficient for the present purpose to say that the petitioner, in response to questions put by the managers, stated that he was the editor and proprietor of the *Daily American Flag*, and was responsible for the printed matter appearing in its columns; and that the article containing the charges in question, though not written by him, was written by his direction and had his approval before publication. Thereafter the petitioner refused to answer any further questions, for reasons stated by him in a written communication presented to the Senate, wherein he professed a desire for a full investigation as to the truth of the charges contained in the article in question, and a willingness on his part to lay before the Senate all the information upon the subject in his possession; but that in his judgment to do so in the manner proposed might defeat the object which he had in view, by affording the guilty parties an opportunity to escape, and the witnesses against them an opportunity to avoid an appearance; and suggesting that to allow the committee already appointed to proceed with the investigation would be a more judicious mode of ascertaining the truth or the falsity of the charges in question. Nevertheless the Senate determined to proceed with the investigation, and the petitioner was asked a series of questions pertinent to the subject matter before the Senate, and was directed by the President pro tem of the Senate to answer the same. In response to each question, when put, the petitioner said : "I decline to answer," or "I decline to answer at this time." Thereupon a preamble and resolution was offered by the Senator from Nevada (Mr. Kutz,) reciting the contumacy of the petitioner, and adjudging him guilty of contempt, and directing that he be committed to the County Jail of Sacramento County until he shall have purged himself of his contempt by answering the questions which had been propounded to him under the direction

of the Senate; which was adopted, and accordingly the commitment under which the Sheriff now holds him in custody was made out under the style of "The People of the State of California," as provided in the Constitution, signed by the President pro tem, and attested by the Secretary of the Senate.

### *Right of witness before the Legislature to aid of counsel.*

At times during the progress of the argument, counsel, unintentionally doubtless, seemed to assume that the petitioner was summoned to the bar of the Senate upon a charge of libel against that body, and was, to some extent at least, on his trial upon a charge of that character. Such a theory, however, is wholly unauthorized by the facts of the case as disclosed by the record before us. At the time the alleged contempt was committed, the Senate was acting under the resolution of the Senator from Placer, (Mr. Hale,) which was, as already stated, to the effect that the petitioner be summoned to the bar of the Senate to testify as a witness touching the charges of corruption against unknown members of that body. Moreover the tenor of the questions put to the petitioner shows clearly that the Senate was seeking to ascertain whether any members of that body had been bribed to vote in a particular way, and if so, who those members were. Hence the petitioner did not stand before the Senate accused of any offense, but as an accuser of other persons against whom charges of bribery and corruption had been indirectly if not directly made by himself. His real attitude was that of a witness. And we may here remark that that fact alone is a complete answer to all that was said at the argument touching the refusal of the Senate to allow him counsel, and fully explains and justifies the conduct of the Senate in that respect, and relieves it from all just criticism on the score that the course pursued was unusual and arbitrary. But were it otherwise we could afford no relief. In this respect *In re Falvey* and *Kilbourn* v. *Massing*, 7 Wisconsin, 630, is on all fours with the present case. There Falvey had been adjudged

guilty of contempt by the Assembly in refusing to answer questions put .to him by a joint committee of both Houses, and committed. The aid of counsel had been denied him, yet the Supreme Court of that State, on habeas corpus, said, (p. 639): " Another objection taken to the commitment is, that the petitioner prayed to be heard by counsel in answer to the charge of contempt, and that this request was denied by the Assembly. The Assembly in refusing to hear the petitioner by counsel before adjudging him in contempt might have acted arbitrarily and improperly. Concede that it did, and yet it was a matter resting solely in the discretion of that body. And as the jurisdiction of the Assembly, acting in this matter, was final, the Court having no appellate power over it, it is not competent for us to revise the proceedings of the Assembly, or suspend its judgment because it has made a mistake or abused its discretion in the premises." (See, also, the case of *Brass Crosby*, 3 Wilson, 188 ; and *Ex parte Kearney*, 7 Wheaton, 38.)

Before going generally into the question of power, it is proper to notice briefly and in their order certain points bearing in some degree upon that question made by counsel for the petitioner at the argument. While both counsel for the petitioner agreed and claimed broadly that the Senate was powerless to act at all in the premises, and could not, therefore, lawfully inquire in any mode into the truth or falsity of the charges for any purpose, yet, while admitting for the sake of the argument, that under proper circumstances and upon proper conditions the Senate might have power to institute and prosecute to some final result and inquire into the matter in question, they each assigned different reasons why, in their judgment, under the peculiar conditions of the present case, the power did not exist. Mr. Coffroth claimed, as we understood him, that although as a general proposition the Senate might have had jurisdiction, yet at the time of this investigation it had no jurisdiction because of the previous appointment of a committee with power to investigate and report, and such committee had not yet reported, nor had it been formally dis-

charged from the further performance of the duty for which it was created.  Mr. Goods, however, grounded the point in question upon the fact, as he claimed, that there was not at the time a material issue before the Senate as to which the petitioner would have committed perjury had he testified and knowingly testified falsely, which is undoubtedly a very good test as to whether there was a material issue.

### *Repugnant resolutions of legislative assembly.*

To the point made by Mr. Coffroth there are at least two answers : first, the point made is not of jurisdictional consequence.   It does not rise above the level of a mere irregularity which would not, however gross, vitiate the final judgment of the Senate ; and second, the resolution of Senator Hale was so repugnant to the previous resolution of Senator Porter, so far as the appointment of the committee was concerned, as to virtually repeal and annul it, or at least to suspend the power of the committee, in analogy to the rule that a statute operates as a repeal of a former statute to which it is repugnant.

### *Material issue within statute against perjury.*

The point made by Mr. Goods in this connection presents the question whether there was at the time a material matter, or issue, or point in question before the Senate within the meaning of the statute against perjury.   There was not, perhaps, any issue in the sense in which the Courts employ that word when speaking technically in the language of the law as applied to pleadings in either civil or criminal actions.   There was no complaint, no indictment, no answer and no plea, yet there was in our judgment a material issue or point in question within the meaning of the statute against perjury, sufficient to sustain an indictment.   The matter contained in the resolution of Senator Porter was before the Senate, and the question or point in issue was whether the charges therein contained were true, and, if true who were the guilty Senators.   That all this amounted to an issue within the meaning

51

of the statute against perjury, may be illustrated by a refer-. ence to proceedings pending before a grand jury, between which and those under review there is, in our judgment, a perfect analogy. It is the duty of a grand jury to inquire into all public offenses which are brought to their notice, and if, after an investigation of the charge by an examination of witnesses, they find that an offense has been committed, to present the same by indictment or otherwise to the Court, in order that the party accused may be tried according to the forms of law. Suppose, then, that some member of the jury, in the mode adopted by Senator Porter in this case, should suggest that he had information that a certain offense had been committed, and that a certain person professed to have information which might lead to the detection of the guilty parties, and suppose that thereupon such person should be summoned before the grand jury to testify as a witness touching such alleged offense. Can there be any doubt but that there would be an issue before the grand jury within the meaning of the statute against perjury? We think not. As was said by the Supreme Court of Massachusetts in *Burnham* v. *Morrissey*, 14 Gray, 239, the Legislature is the grand inquest of the Commonwealth. As such, it has the power to inquire into the conduct of the officers of the State, with a view to their impeachment if they find any cause therefor. It may inquire into the election and qualification of its own members, with a view to their admission or expulsion. It may inquire into a variety of matters, with a view to apt legislation. Such inquiries may be inaugurated by any mode which may be thought most practicable or convenient—the mode is immaterial. Whenever it is proposed to institute an inquiry touching any matter of public concern within their jurisdiction, by any mode which they may choose to adopt, there is, to every legal intent, a material issue presented touching which witnesses may be examined and subject themselves, by testimony wilfully false, to all the pains and penalties of perjury.

Having disposed of the foregoing collateral questions, we now come to the consideration of the main proposition.

*Power of Senate to investigate charges of bribery against its members.*

Had the Senate the power or jurisdiction to investigate the charges of bribery in question for any purpose ?

We shall first consider this question by the light of the common parliamentary law, independent of any restrictions placed thereon by the Constitution or any laws made in pursuance. thereof.

A legislative assembly, when established, becomes vested with all the powers and privileges which are necessary and incidental to a free and unobstructed exercise of its appropriate functions. These powers and privileges are derived not from the Constitution ; on the contrary, they arise from the very creation of a legislative body, and are founded upon the principle of self preservation. The Constitution is not a grant, but a restriction upon the power of the Legislature, and hence an express enumeration of legislative powers and privileges in the Constitution cannot be considered as the exclusion of others not named unless accompanied by negative terms. A legislative assembly has, therefore, all the powers and privileges which are necessary to enable it to exercise in all respects, in a free, intelligent and impartial manner, its appropriate functions, except so far as it may be restrained by the express provisions of the Constitution, or by some express law made unto itself, regulating and limiting the same. (Cushing's Law and Practice of Legislative Assemblies, p. 221.)

What powers and privileges, therefore, a legislative assembly takes by force and effect of its creation, are to be ascertained by a reference to the common parliamentary law. These powers and privileges are classified by Cushing (p. 246) as follows :

1. To judge of the returns, elections and qualifications of its own members.

2. To choose its own officers and remove them at pleasure.

3. To establish its own rules of proceeding.

4. To have the attendance and service of its own members.

5. To be secret in its proceedings and debates.

6. *To preserve its own honor, dignity, purity and efficiency, by the expulsion of an unworthy, or the discharge of an incompetent member.*

7. To protect itself and its members from personal violence.

8. To protect itself and its members from libellous and slanderous attacks.

9. *To protect itself and its members from corruption.*

10. To require information touching public affairs, from the public officers.

11. To require the opinion of the Judges and other law officers on important occasions.

12. *To investigate, by the testimony of witnesses or otherwise, any subject or matter, in reference to which it has power to act; and, consequently, to protect parties, witnesses and counsel, in their attendance, when summoned, or having occasion to attend for that purpose.*

13. To be free from all interference of the other co-ordinate branch, and of the executive and judicial departments, in its proceedings on any matter depending before it.

Speaking at page two hundred and fifty, of the sixth of the foregoing subdivisions, the learned author says: " The power to expel a member is naturally and even necessarily incidental to all aggregate, and especially all legislative bodies, which, without such power, could not exist honorably and fulfil the object of their creation."

At page two hundred and fifty-one he speaks thus of the eighth subdvision: " No form of attack upon the rights and privileges of a legislative assembly has been more common or subjected offenders to a severer punishment than this. When the libel is on the assembly itself there can be but little doubt of its authority to punish the offender; but when it is committed against a member it can hardly be considered a breach of privilege, unless it attack him in that capacity or on account of something said or done by him as a member."

At page two hundred and fifty-three he speaks thus of the

twelfth subdivision touching the right of investigation: "It has always, at least practically, been considered the right of legislative assemblies to call upon and examine all persons within their jurisdiction as witnesses in regard to subjects in reference to which they have power to act, and into which they have already instituted or are about to institute an investigation. Hence they are authorized to summon and compel the attendance of all persons within the limits of their constituency as witnesses, and to bring with them papers and records, in the same manner as is practiced by Courts of law. When an assembly proceeds by means of a committee in the investigation of any subject the committee may be and usually is authorized by the assembly to send for persons, papers and records. Witnesses before a legislative assembly or committee are not sworn, unless there is some express provision of law or Constitution authorizing their examination in that manner; but they give their testimony under the penalty of being adjudged guilty of a contempt, and punished accordingly if they prevaricate or testify falsely."

Such are some of the powers and privileges of a legislative assembly under the law of its creation, or in other words, under the common parliamentary law. In their support we content ourselves with a citation of the following authorities: *Burdett* v. *Abbott*, 14 East. 138; *Burdett* v. *Coleman*, 14 East. 163; *Coffin* v. *Coffin*, 4 Mass. 35; *State* v. *Mathews*, 37 N. H. 453; *Burnham* v. *Morrissey*, 14 Gray, 241; *Kilbourn* v. *Massing*, 7 Wisconsin, 638; *Anderson* v. *Dunn*, 6 Wheaton, 204.

Thus by the common parliamentary law the Senate has the power, among other things, to judge of the qualifications of its own members, to preserve its own honor, dignity, purity and efficiency, by the expulsion of an unworthy or the discharge of an incompetent member; to protect itself and its members from corruption; and as necessary to the intelligent exercise of those powers they may summon and examine witnesses and compel them to testify by process of contempt, when without good cause they refuse to do so.

The charge that seven members of the Senate had been

bribed was a charge affecting the honor, dignity, purity and efficiency of that body ; and the Senate therefore, under the common parliamentary law, had the power to investigate the charge with the view to the expulsion of the guilty members, if any such could be found, and to that end to summon the petitioner to the bar of the Senate to testify as a witness touching the same, and to commit him for contempt for refusing to testify without sufficient legal cause.

These powers of the Senate, under the common parliamentary law, are not trenched upon by the Constitution or any law made in pursuance thereof. On the contrary, so far as the Constitution and laws of the State treat of the subject, they but affirm and enlarge, so far as the present case is concerned, the common parliamentary law. The Constitution provides that " each House shall choose its own officers, and judge of the qualifications, elections and returns of its own members " (Sec. 8, Art. 4) ; that "each House shall determine the rules of its own proceedings, and may, with the concurrence of two thirds of all the members elected, expel a member." (Sec. 10, Art. 4.) By no provision of the Constitution is the Senate denied the power which they exercised in the present case. Thus unrestrained by the Constitution, the Legislature, on the 25th of March, 1857, passed an Act, entitled " An Act to enforce more effectually the attendance of witnesses on the summons of either House of the Legislature of this State, and to compel them to discover testimony " (Statutes 1857, p. 97) ; which entirely covers this case, so far as the power to commit the petitioner as for a contempt in refusing to testify is concerned. So far as this Act confers power to commit a contumacious witness, it but confirms, as we have already seen, the common parliamentary law. By the fifth section of that Act it is provided that " if any witness shall neglect or refuse. to obey such summons " (previously provided for), " or appearing, shall neglect or refuse to testify to any matter touching the inquiry then before such committee, Senate or Assembly, the Senate or Assembly, as the case may be, shall and may, in addition to the pains and penalties

hereinbefore mentioned, by resolution entered on the journal, commit such witness as for contempt, and such witness shall be imprisoned until he shall comply with the order of the Senate, Assembly or committee, which imprisonment shall not be a bar to proceedings under the foregoing sections of this Act, and if such witness neglect or refuse to attend in obedience to summons, he may be arrested by the Sergeant-at-Arms and brought before the Senate or Assembly, as the case may be; provided, that the only warrant or authority necessary to authorize such arrest shall be a copy of a resolution of the Senate or Assembly, signed by the President of the Senate or Speaker of the Assembly, and countersigned by the Secretary or Clerk.    Such resolution may be entered on the report of the committee."

Thus stands the law.    And in conclusion we have only to add that in our judgment the power of the Senate to investigate the charges in question, to summon and examine the petitioner as a witness, and to commit him, as for contempt, for refusing to answer the questions propounded to him, does not admit of a doubt.    In our judgment the Senate has in no respect exceeded its jurisdiction.

Certain points as to the sufficiency of the commitment and as to the place of confinement were made, but in our judgment they are not of sufficient importance to require special notice.

Let the petitioner be remanded.