[No. 30523. *En Banc.* March 18, 1948.]

THE STATE OF WASHINGTON, *on the Relation of Dana T. Robinson, Plaintiff,* v. RUSSELL H. FLUENT, *as State Treasurer, Respondent,* WASHINGTON PENSION UNION, *Intervener.*[1]

[1]Reported in 191 P. (2d) 241.

*Ford Q. Elvidge* and *Chas. C. Ralls, Special Assistants Attorney General,* for relator.

*Stanbery Foster, Special Assistant Attorney General,* for respondent.

*Caughlan & Hatten,* for intervener.

*George E. Flood, Richard S. Munter, George C. Kinnear,* and *Joseph E. Hurley, amici curiae.*

MILLARD, J.—This is an original application for a writ of mandamus to compel the state treasurer to pay a warrant drawn by the state auditor on the state treasurer in payment

of compensation of relator for services rendered to the joint legislative fact-finding committee on un-American activities (Laws of 1947, p. 1378), created by house concurrent resolution No. 10 of the 1947 legislature. Respondent treasurer demurs to and moves denial of the application upon the grounds (1) that the 1947 legislature was without authority to establish by concurrent resolution any committee to function after adjournment *sine die* of that legislature; (2) that no valid appropriation exists from which to pay relator's warrant. Washington Pension Union, a domestic corporation, has been permitted to intervene and resist application of relator for a writ of mandate.

The joint legislative fact-finding committee on un-American activities was created by the 1947 session of the legislature, by the concurrent action of both Houses. The resolution originated in and was passed by the House, March 3, 1947, and was signed by the speaker of the House. The resolution passed the Senate, March 8, 1947, and was signed by the president of the Senate. Concurrent resolution No. 10 (Laws of 1947, p. 1378) reads as follows:

"*Be It Resolved,* By the House of Representatives, the Senate concurring, of the State of Washington in legislative session assembled:

"WHEREAS, These are times of public danger; subversive persons and groups are endangering our domestic unity, so as to leave us unprepared to meet aggression, and under cover of the protection afforded by the bill of rights these persons and groups seek to destroy our liberties and our freedom by force, threats and sabotage, and to subject us to the domination of foreign powers; and

"WHEREAS, Recent announcements by responsible officers of the federal government indicate the seriousness of the problem. J. Edgar Hoover, Director of the Federal Bureau of Investigation recently said: 'During the past five years American Communists have made their deepest inroads upon our national life. Their propaganda, skillfully designed and adroitly executed has been projected into practically every phase of our national life. The Communist influence has projected itself into some newspapers, books, radio and the screen, some churches, schools, colleges and even fraternal orders have been penetrated, not with the approval of the rank and file, but in spite of them'; and

"Whereas, State legislation to meet the problem and to assist law enforcement officers can best be based on a thorough and impartial investigation by a competent and active legislative committee;

"*Now, Therefore, Be It Resolved,* That there is hereby created a Joint Legislative Fact-finding Committee on Un-American Activities in the State of Washington which shall investigate, ascertain, collate and appraise all facts concerning individuals, groups or organizations whose activities are such as to indicate a purpose to foment internal strife, discord and dissension; infiltrate and undermine the stability of our American institutions; confuse and mislead the people, and impede the normal progress of our state and nation either in a war time or a peace time economy; and

"*Be It Further Resolved,* That in addition to other duties imposed upon the committee, the committee shall investigate the activities of groups and organizations whose membership includes persons who are communists, or any other organization known or suspected to be dominated or controlled by a foreign power, which activities affect the conduct of this state, the functioning of any state agency, unemployment relief and other forms of public assistance, educational institutions of this state supported in whole or in part by state funds, or any political program; and

"*Be It Further Resolved,* That the committee shall consist of four members of the House of Representatives, appointed by the speaker thereof; and three members of the Senate appointed by the president thereof and they shall be subject to confirmation of their respective bodies. The speaker of the House of Representatives shall appoint the chairman of the board; and

"*Be It Further Resolved,* That the committee hereby created in exercising the powers and performing the functions vested in it by this resolution shall have: (I) All the powers conferred upon legislative committees by chapter 6, Laws of 1895 and chapter 33, Laws of 1897; (II) except when inconsistent with this resolution, all the powers conferred upon committees by the rules of the House of Representatives, the rules of the Senate, and the joint rules of the Senate and House of Representatives as they are enacted and amended from time to time and such rules are hereby incorporated herein and made a part hereof the same as if they were set forth in this resolution in full; (III) all powers necessary or convenient to accomplish the objects and purposes of this resolution, including but not limited to the following duties and powers:

"(1)  To employ and fix the compensation of a secretary and such clerical, legal, expert and technical assistants as it may deem necessary, and to lease, rent or buy such supplies and facilities as may be required;

"(2)  The chairman shall have authority to create subcommittees from its membership, assigning to the subcommittee any study, inquiry, investigation or hearing which the committee itself has authority to undertake or hold, and the subcommittee for the purpose of this assignment shall have and exercise all of the powers conferred upon the committee limited by the express terms of the resolution or resolutions of the latter defining the powers and duties of the subcommittee, which powers may be withdrawn or terminated at any time by the committee;

"(3)  To adopt and from time to time amend such rules governing its procedure (including the fixing of its own quorum and the number of votes necessary to take action on any matter) as may to it appear appropriate;

"(4)  To contract with such other agencies, public or private, as it deems necessary for the rendition and affording of such services, facilities, studies and reports to the committee as will best assist it to carry out the purposes for which it is created;

"(5)  To hold public hearings at any place in the State of Washington at which hearings the people are to have an opportunity to present their views to the committee;

"(6)  To make a complete study, survey and investigation of every phase of the subject of this resolution, including but not limited to the operation, effect, administration, enforcement, and needed revision of any and all laws in anywise bearing upon or relating to the subject of this resolution;

"(7)  To meet at any and all places in this state, in public or executive session;

"(8)  To act during this session of the legislature, including any recess hereof, and after final adjournment hereof until commencement of the thirty-first legislature;

"(9)  To file a report with the thirty-first legislature;

"(10)  To summon and subpoena witnesses, require the production of papers, books, accounts, reports, documents, and records of every kind and description; to issue subpoenas and to take all necessary means to compel the attendance of witnesses and procure testimony; to pay fees and traveling expenses of witnesses to insure their attendance, if necessary; to procure from any court having jurisdiction, upon complaint showing probable cause to believe that pertinent evidence is being concealed or withheld from

the committee, a search warrant and cause a search to be made therefor;

"(11) To cooperate with and secure the cooperation of county, city, city and county and other local enforcement agencies in investigating any matter within the scope of this resolution, and to direct the sheriff of any county to serve subpoenas, orders and other process issued by the committee; and

"(12) To do any and all other things necessary or convenient to enable it fully and adequately to exercise its powers, perform its duties, and accomplish the objects and purposes of this resolution; and in case of disobedience on the part of any witness to comply with any subpoena issued by the committee or on the refusal of any person to testify regarding any matter on which he may be lawfully interrogated, the superior court of any county, or the judge thereof, on application of the committee, shall compel compliance by proceedings for contempt, as in the case of disobedience of the requirements of a subpoena issued from such court or a refusal to testify therein; and

"*Be It Further Resolved,* That the committee, each of its members, and any representative of the committee thereunto authorized by the committee or by its chairman, is authorized and empowered to administer oaths; and

"*Be It Further Resolved,* That every department, commission, board, agency, officer and employee of the state government, including the attorney general, and their subordinates, and of any political subdivision, county, city, or public district of or in this state shall furnish the committee and any subcommittee, upon request, any and all such assistance, and information, records and documents as the committee or subcommittee deems proper for the accomplishment of the purposes for which the committee is created; and

"*Be It Further Resolved,* That the Washington state patrol and all officers and members thereof shall furnish such assistance to the committee as the chairman may direct; and

"*Be It Further Resolved,* That the members appointed to the joint Legislative Fact-finding Committee on Un-American Activities shall be reimbursed for their expenses incurred while attending sessions of the committee or subcommittee to the extent of fifteen dollars ($15) per day plus five cents (5¢) per mile in going to and coming from meetings or hearings of the committee or subcommittee, the same to be paid upon their individual vouchers, approved by the chairman of the committee, from any moneys appropriated for the expense of the thirtieth legislature, or from such

other funds as may be made available therefor; and that the salaries and expenses of any expert, clerical, and other assistants employed by the committee shall be paid upon vouchers approved by the chairman of the committee from such funds."

Respondent contends that, in view of the following restrictive provisions of the state constitution, the legislature may not, by concurrent resolution, create a valid interim committee to function after adjournment *sine die* of the legislative body which created it:

Art. II, § 1. "The legislative powers shall be vested in a senate and house of representatives, which shall be called the legislature of the state of Washington."

Art. II, § 5. "The next election of the members of the house of representatives after the adoption of this constitution shall be on the first Tuesday after the first Monday of November, eighteen hundred and ninety, and thereafter members of the house of representatives shall be elected biennially, and their term of office shall be two years; and each election shall be on the first Tuesday after the first Monday in November, unless otherwise changed by law."

Art. II, § 6. "After the first election the senators shall be elected by single districts of convenient and contiguous territory at the same time and in the same manner as members of the house of representatives are required to be elected, and no representative district shall be divided in the formation of a senatorial district. They shall be elected for the term of four years, one half of their number retiring every two years. The senatorial districts shall be numbered consecutively, and the senators chosen at the first election had by virtue of this constitution, in odd-numbered districts, shall go out of office at the end of the first year, and the senators elected in the even-numbered districts shall go out of office at the end of the third year."

Art. II, § 8. "Each house shall be the judge of the election, returns, and qualifications of its own members, and a majority of each house shall constitute a quorum to do business, but a smaller number may adjourn from day to day and may compel the attendance of absent members in such manner and under such penalties as each house may provide."

Art. II, § 12. "The first legislature shall meet on the first Wednesday after the first Monday in November, A. D. 1889.

The second legislature shall meet on the first Wednesday after the first Monday in January, A. D. 1891, and sessions of the legislature shall be held biennially thereafter, unless specially convened by the governor, but the times of meeting of subsequent sessions may be changed by the legislature. After the first legislature the sessions shall not be more than sixty days."

Respondent argues that it is clear, from a reading of the foregoing constitutional provisions, that at the conclusion of the sixty-day session, or less, of the legislature and its adjournment *sine die,* the legislative functions of that particular body cease, and that the next session of the legislature will be one entirely independent of it; that is, when a legislature adjourns *sine die,* that legislature ceases to exist, and, as there are no legislative powers attached to the term of the legislators as such, but, rather, the legislative powers are restricted to the legislature, which again is limited to sixty days, such legislature cannot legislate subsequent to its adjournment *sine die,* nor can it appoint an interim committee to obtain facts to guide legislation when the legislature appointing the committee cannot act on those facts in a legislative manner.

The interim committee created by House concurrent resolution No. 10 of the 1947 legislature is an investigatory committee. In connection with its powers of investigation and carrying out same, the committee is authorized by the concurrent resolution to employ and pay for assistance, to hold public hearings, and to act during the session of the legislature, including any recess thereof, and to act after a final adjournment of the legislature until the commencement of the next legislature. The duty is imposed upon the committee to file a report with the next session of the legislature. Clearly, it is an "interim" committee. The committee is composed of four members of the House and three members of the Senate. Its expenses are to be paid upon vouchers approved by the chairman, from moneys appropriated for the expenses of the legislature which created the committee, or from such other funds as may be made available therefor. The warrant held by the relator was issued by the state auditor and drawn on that fund.

The question whether the legislature may project its *investigatory* function into the interim and until the next session of the legislature is foreclosed by our opinion in *State ex rel. Hamblen v. Yelle,* 29 Wn. (2d) 68, 185 P. (2d) 723, in which we held that by statute a legislative committee may be created and authorized to sit during the interim between sessions for the purpose of making necessary investigations for the ascertainment of such facts as are a necessary predicate for the enactment of laws.

The powers of such committees are not restricted to investigations upon matters pertinent to legislation only. Legislative committees may be created to investigate into any subject legitimately within the scope of the functions, powers, and duties of the legislature, and to secure information necessary to the proper discharge thereof. See 49 Am. Jur. 260.

There is no difference in principle between the legislative council created by the Laws of 1947, chapter 36, and the interim committee created by house concurrent resolution No. 10 of the 1947 session of the legislature. Both are investigating committees, and each is given substantially the same powers of investigation. The difference between them is one of means of creation. The legislative council was created by statute, while the interim committee under consideration in the case at bar was created by concurrent resolution. Neither legislates. Each investigates.

The function of investigation during the interim is an inherent power in the legislature. If there is not present in the constitution a restraint against the exercise of interim investigatory power by the legislature through joint or concurrent action, that power, which is incidental to the function of making laws, may be projected into the interim.

The constitutional provision (Art. II, § 12) that, after the first legislature, the sessions shall not be more than sixty days, is a limitation upon the power of enacting laws and is in no sense a limitation upon the function of investigation. That it is not a limitation upon the function of investigation, we held in *State ex rel. Hamblen v. Yelle, supra.* In the case cited, we recognized the inherent power of the legis-

lature to project its investigatory function into the interim, and until the next session of the legislature. An investigating committee in that case was created by statute. Clearly, as observed by counsel for relator, if the legislature "cannot breathe life into itself during the interim by a joint or concurrent resolution, it can not do it by statute."

There is no limitation in the constitution upon the power of the legislature to act by resolution. We so held in *State ex rel. Mullen v. Howell,* 107 Wash. 167, 181 Pac. 920, where we said:

"It is true that we have no provision in our constitution providing for the passage of resolutions, even in the formal matters in which the legislature has throughout the entire history of our territory and state been wont to act, but it is just as evident that there is no limitation upon the power of the legislature to act by resolution."

A state constitution is not a grant, but a restriction upon the powers of the legislature; and, hence, an express enumeration of legislative powers is not an exclusion of others not named, unless accompanied by negative terms. The powers and privileges which are necessary to the proper exercise, in all respects, of its appropriate functions, are inherent in the legislature and are to be ascertained primarily by a reference to the common parliamentary law.

"A legislative assembly, when established, becomes vested with all the powers and privileges which are necessary and incidental to a free and unobstructed exercise of its appropriate functions. These powers and privileges are derived not from the Constitution; on the contrary, they arise from the very creation of a legislative body, and are founded upon the principle of self-preservation. The Constitution is not a grant, but a restriction upon the power of the Legislature, and hence an express enumeration of legislative powers and privileges in the Constitution cannot be considered as the exclusion of others not named unless accompanied by negative terms. A legislative assembly has, therefore, all the powers and privileges which are necessary to enable it to exercise in all respects, in a free, intelligent, and impartial manner, its appropriate functions, except so far as it may be restrained by the express provisions of the Constitution, or by some express law made unto itself, regulating and

limiting the same. (Cush. Law and Practice of Legislative Assemblies, p. 221.)

"What powers and privileges, therefore, a legislative assembly takes by force and effect of its creation are to be ascertained by a reference to the common parliamentary law." *Ex parte McCarthy*, 29 Cal. 395.

The United States Senate adopted a resolution authorizing and directing a committee of five senators to investigate and report to the Senate concerning certain conduct of the then attorney general of the United States. The committee was authorized by the resolution to send for books and papers, to subpoena witnesses, to administer oaths, and to sit at such times and places as it might deem advisable. The brother of the one under investigation refused to obey a subpoena to appear before the committee. A resolution was adopted directing a warrant for his arrest, to be executed by the sergeant at arms of the Senate. In *habeas corpus* proceedings in the United States district court, the recalcitrant witness was discharged from the custody of the deputy sergeant at arms of the Senate, who appealed to the United States supreme court from that order. *McGrain v. Daugherty*, 273 U. S. 135, 71 L. Ed. 580, 47 S. Ct. 319, 50 A. L. R. 1.

The first of the principal questions in that case was whether the Senate or the House of Representatives, each being on the same plane in that regard, had power through its own process to compel a private individual to appear before it or one of its committees and give testimony to enable it efficiently to exercise a function belonging to it under the constitution. The court stated that no specific authority was granted to Congress by the constitution, and said:

"So the question arises whether this power is so far incidental to the legislative function as to be implied.

"In actual legislative practice power to secure needed information by such means has long been treated as an attribute of the power to legislate. It was so regarded in the British Parliament and in the Colonial legislatures before the American Revolution; and a like view has prevailed and been carried into effect in both houses of Congress and in most of the state legislatures. . . .

"We are of the opinion that the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function. It was so regarded and employed in American legislatures before the Constitution was framed and ratified. Both houses of Congress took this view of it early in their history—the House of Representatives with the approving votes of Mr. Madison and other members whose service in the convention which framed the Constitution gives special significance to their action—and both houses have employed the power accordingly up to the present time. The acts of 1798 and 1857, judged by their comprehensive terms, were intended to recognize the existence of this power in both houses and to enable them to employ it 'more effectually' than before. So, when their practice in the matter is appraised according to the circumstances in which it was begun and to those in which it has been continued, it falls nothing short of a practical construction, long continued, of the constitutional provisions respecting their powers, and therefore should be taken as fixing the meaning of those provisions, if otherwise doubtful.

"We are further of opinion that the provisions are not of doubtful meaning, but, as was held by this Court in the cases we have reviewed, are intended to be effectively exercised, and therefore to carry with them such auxiliary powers as are necessary and appropriate to that end. While the power to exact information in aid of the legislative function was not involved in those cases, the rule of interpretation applied there is applicable here. A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed. All this was true before and when the Constitution was framed and adopted. In that period the power of inquiry—with enforcing process—was regarded and employed as a necessary and appropriate attribute of the power to legislate—indeed, was treated as inhering in it. Thus there is ample warrant for thinking, as we do, that the constitutional provisions which commit the legislative function to the two houses are intended to include this attribute to the end that the function may be effectively exercised.

"The contention is earnestly made on behalf of the witness that this power of inquiry, if sustained, may be abusively and oppressively exerted. If this be so, it affords no ground for denying the power. The same contention might be directed against the power to legislate, and of course would be unavailing. We must assume for present purposes, that neither house will be disposed to exert the power beyond its proper bounds, or without due regard to the rights of witnesses. . . .

"The only legitimate object the Senate could have in ordering the investigation was to aid it in legislating; and we think the subject-matter was such that the presumption should be indulged that this was the real object. An express avowal of the object would have been better; but in view of the particular subject-matter was not indispensable. In the *Chapman* case, where the resolution contained no avowal, this Court pointed out that it plainly related to a subject-matter of which the Senate had jurisdiction, and said 'We cannot assume on this record that the action of the Senate was without a legitimate object'; and also that 'it was certainly not necessary that the resolutions should declare in advance what the Senate meditated doing when the investigation was concluded.' (166 U. S. 669-670.) In *People v. Keeler,* 99 N. Y. 463, where the Court of Appeals of New York sustained an investigation ordered by the Senate of that state where the resolution contained no avowal, but disclosed that it definitely related to the administration of a public office the duties of which were subject to legislative regulation, the court said (pp. 485, 487): 'Where public institutions under the control of the State are ordered to be investigated it is generally with the view of some legislative action respecting them, and the same may be said in respect of public officers.' And again: 'We are bound to presume that the action of the legislative body was with a legitimate object if it is capable of being so construed, and we have no right to assume that the contrary was intended.' "

*People ex rel. McDonald v. Keeler,* 99 N. Y. 463, 2 N. E. 615, 52 Am. Rep. 49, was cited with approval in *McGrain v. Daugherty, supra,* where the validity of the statute of New York recognizing and giving effect to the power of the legislature to investigate during the interim was drawn in question. The court said:

" 'It is difficult to conceive any constitutional objection which can be raised to the provision authorizing legislative

committees to take testimony and to summon witnesses. In many cases it may be indispensable to intelligent and effectual legislation to ascertain the facts which are claimed to give rise to the necessity for such legislation, and the remedy required, and, irrespective of the question whether in the absence of a statute to that effect either house would have the power to imprison a recusant witness, I cannot yield to the claim that a statute authorizing it to enforce its process in that manner is in excess of the legislative power.' "

In *People ex rel. Hastings v. Hofstadter*, 258 N. Y. 425, 180 N. E. 106, 79 A. L. R. 1208, the court said, respecting the power of a New York legislative interim committee to cause the arrest of a witness through the aid of the court,

"It is not in aid of a proceeding in a court of justice. It is in aid of a legislative function, the ascertainment of facts whereon to build the statutes of the future (*People ex rel. Karlin v. Culkin*, 248 N. Y. 465, 478). The judge issuing the warrant is merely the implement of the Legislature, appointed by statute to act in its behalf. . . .

"The subpoena is assailed upon the ground that the life of the committee ended upon the final adjournment of the Legislature on April 10, 1931, or, at the latest, on December 31, 1931, with the end of the term of office for which one of the two houses had been chosen.

"We have little difficulty in overruling this contention in so far as it has relation to the life of the committee during the months of adjournment and until the end of the year. The great weight of judicial authority sustains the power of the Legislature to invest its committees with power to function though the session is over."

The constitution of the state of New York provides that the political year and legislative term shall begin on the first day of January and that the legislature shall every year assemble on the first Wednesday after the first Monday in January. Art. XIII, § 9, New York state constitution. In New York there is no express constitutional limitation on the duration of legislative sessions, which are held annually. All members of the legislature are elected for two years which, of course, includes service in two legislative sessions.

In this state the legislative sessions are limited by the constitution to a period of sixty days, and the members of the House are elected for only one regular session. Members of the state Senate are elected for a term of four years and one half of their number retire every two years. The constitution (Art. II, § 1) of this state vests the legislative powers of the state in a Senate and House of Representatives, which is designated the legislature of the state. Art. III, § 1, of the New York state constitution, which reads as follows, is not dissimilar from Art. II, § 1, of our state constitution:

"The legislative powers of this state shall be vested in a senate and assembly."

In *People v. Backer,* 185 N. Y. Supp. 459, the court of general sessions of New York county—an inferior court of the state of New York—held that, the legislative power of the state being vested in the Senate and the assembly by the New York constitution, the legislature may create committees or commissions by concurrent resolution, as well as by statute, with power to function after adjournment of the legislature, and the legislature may confer on the committees or commissions thus created such power as the legislature is not prohibited by express provision of the constitution from conferring. The court said:

"The power of the Legislature to appoint the committee and to authorize it to conduct the investigation is not disputed. But the defendant claims that the only way in which a legislative committee may be empowered to sit and function after adjournment of the Legislature is by bill, or, in other words, by a statute enacted by the Legislature and approved by the Governor, or passed over his veto. The defendant has cited cases in other states in which it was held that the power of a legislative committee to sit and function after the Legislature has adjourned must be conferred by statute, and that a concurrent resolution will not suffice to enable it to function after the Legislature has adjourned. Cases in other jurisdictions take a contrary view. As we are not without authority in this state, I do not consider it necessary to discuss such cases in detail.

"It is provided by article 3, § 14, of the Constitution of New York that 'no law shall be enacted except by bill.' The 'law' there referred to means statute law—the enacted law

governing the relations between the state and its inhabitants and the relations of its inhabitants one with another. 'A concurrent resolution of the two houses is not a statute.' *People ex rel. Argus Co. v. Palmer,* 12 Misc. Rep. 392, 394, 33 N. Y. Supp. 1088, affirmed, on opinion of Special Term. 146 N. Y. 406, 42 N. E. 543, not 'a law.' But it is law in the sense that it is an authorized act of the legislative body. It is effective for the purpose for which it was adopted, and what is done pursuant thereto is lawfully done. The adoption of a concurrent resolution, while not in a technical sense the enactment of a bill or the passage of a law, is nevertheless a lawful act of the Legislature, an act which it has power to perform. And such a resolution, providing for the appointment of a joint committee and conferring certain powers on such committee, is, so to speak, the law by which such committee is created, and under and by virtue of which it acts. It is, in other words, the charter which contains the grant of power.

"There is no specific authority in the Constitution of this state for the adoption or passage of concurrent resolutions. But there is nothing in the Constitution which prohibits their passage, and unless expressly prohibited by the Constitution, the legislative power is unrestricted and unlimited. *People v. Learned,* 5 Hun, 626. The legislative power of the state is vested in the Senate and Assembly. N. Y. Const. art. 3, § 1. Those bodies may create committees or even commissions by concurrent resolution as well as by act (*People v. Learned, supra*),. and they may confer upon such committees or commissions such power as they are not prohibited by express provision of the Constitution from conferring. I find nothing in the Constitution which prohibits the Legislature either from appointing committees by concurrent resolution or from authorizing committees by such a resolution to sit and function during recess of the Legislature or between sessions thereof. The purpose for which legislative committees are generally appointed is to conduct investigations into matters of public concern with a view to proposing remedial legislation. Such investigations are more or less protracted, and consequently it is usually provided by the resolution that the committee may sit and act during recess or after adjournment of the Legislature. Such is the case here.

"From time immemorial the practice of conferring power on legislative committees by concurrent resolution to sit and function between sessions of the Legislature has been exercised in this state. As early as 1846 the learned John Van

Buren, then Attorney General of the state, rendered an opinion in which he held that a resolution empowering a legislative committee to sit, if necessary, during the recess of the Legislature, and to report to the next Legislature, was valid. Since then innumerable legislative committees have been appointed in this state by concurrent resolutions, and empowered by the resolutions to sit during recess or after adjournment of the Legislature, and, so far as I can ascertain, no one has ever thought of disputing the authority or legality of the conferring of such a power by resolution of the two houses. This fact alone would seem entitled to controlling weight on the question of constitutionality. *People ex rel. Williams v. Dayton,* 55 N. Y. 367. Furthermore, a general statute of this state (Code Civ. Proc. § 854) expressly recognizes the power of 'a committee of either house of the Legislature, or a joint committee thereof, duly empowered by resolution or act to sit and take testimony during the session of the Legislature or after the adjournment thereof.' See *Matter of Barnes,* 204 N. Y. 108, 121, 97 N. E. 508, opinion of Werner, J.

"There being no constitutional inhibition upon the power of the Senate and Assembly to confer power upon the committee to sit during the recess or after the adjournment of the Legislature, the contention of the defendant that such a power could not be granted by concurrent resolution is, I think, without merit."

By joint resolution, March 23, 1931, the legislature of New York appointed a committee to investigate the administration of the departments of the government of the city of New York. The resolution provided that the committee might act

". . . during the session of the legislature and during the recess or after adjournment thereof, with the same power or authority it would have were the legislature in session."

The committee functioned throughout the interim and carried over into a new term of the legislature. A subpoena issued by the committee was served upon State Senator Hastings, requiring him to attend as a witness, which he declined to do on the ground that the service of the subpoena was a breach of his privilege as a member of the Senate which was then in session, and that the jurisdiction

of the committee had expired by lapse of time. The court of appeals of New York, in *People ex rel. Hastings v. Hofstadter,* 258 N. Y. 425, 180 N. E. 106, 79 A. L. R. 1208, held that the life of the interim committee is, for all purposes, continued into the new term, because a statute appropriating money for its expense appropriated a sum sufficient to show that it was intended that the committee's activities should go beyond the term. In other words, that amounted to a statutory confirmation, or ratification, of the power to sit beyond the term. The court stated it had little difficulty in overruling the contention of Hastings, so far as it had relation to the life of the committee during the months of adjournment and until the end of the year. The court said that:

"The great weight of judicial authority sustains the power of the Legislature to invest its committees with power to function though the session is over (*People v. Learned,* 5 Hun, 626; *Matter of Davis,* 58 Kan. 368, 370; *Matter of Caldwell,* 61 W. Va. 49; *Commonwealth v. Costello,* 21 Penn. Dist. Rep. 232; *Commercial & Farmers Bank v. Worth,* 117 N. C. 146). A distinction has been drawn between a resolution by a single house (*Matter of Caldwell, supra*) and the joint action of the two houses, but the distinction is unimportant here where the resolution was concurrent. To the weight of judicial authority is to be added that of a practical interpretation ancient and unbroken. Many instances, brought together by the industry of counsel for the committee, are stated in the brief. A closer question arises when we ask ourselves whether a mere resolution may invest a committee with power when the year is at an end for which the Assembly was elected. Undoubtedly the members of the committee will be permitted to report, for to say that they may do this is to say little more than that the Legislature is at liberty to hear them if it will. This does not mean of necessity that a committee appointed in one year may exercise in a later year all the powers that belonged to it at the time of its creation, the power to disburse the appropriated moneys, the power to subpoena, and the power to punish for contempt. For many purposes, a newly-elected house is deemed a newly created body, its life not continuous with that of the house that went before it (*Opinion of the Justices to the Senate,* 239 Mass. 603; cf. *Matter of Hague,* [N. J.] 147 Atl. Rep. 220). This is probably the

reason why the rules of each house are adopted anew when a new house is elected, though the long continued practice is to renew them without change (Cushing, *supra*, § 613; Jefferson's Manual [ed. Deschler], § XI, p. 117). Accordingly, treatises of weight give support to the view that the authority of a legislative body may not be continued by resolution beyond the expiration of the term for which the body was elected, and that if life is to be prolonged thereafter, the result must be attained by the adoption of a statute (Hinds, Precedents of the House of Representatives, vol. IV, § 4545; Jefferson's Manual, § LI, p. 249; Cushing, *supra*, § 497).

"We leave the question open, for the record now before us does not require us to answer it. Statutory confirmation after a resolution has been adopted is as effective as statutory authority in advance of its adoption (*People v. Learned*, 5 Hun, 626). Such confirmation is clearly visible when the course of legislation with reference to this committee is followed through the year. By chapter 637 of the Laws of 1931, which became a law April 22, 1931, there was appropriated in aid of this inquiry the sum of $250,000 to be added to a like sum included in the budget. The language of the act is that 'the sum hereby appropriated shall be available for the use of the joint legislative committee appointed pursuant to joint resolution of the legislature, to investigate the affairs of the city of New York, and shall be payable only on audit of the comptroller, after approval by the speaker of the assembly and the president *pro tempore* of the senate and also by the chairman of the committee.' The Legislature that passed this act must have known that the committee was to continue till February of the next year when its report would be presented. The conclusion is almost unthinkable that the appropriation was not to be available for the printing of the report and for other necessary disbursements during the weeks immediately preceding the date of presentation. If the committee could exercise its functions by drafts on the public purse, it could exercise them also by continuing to inquire. Even more significant are the provisions of a later act (Laws of 1931, ch. 773) adopted on August 28, 1931, the work of a special session called by the Governor for the declared purpose of supplying this committee with powers denied to it before (*Matter of Doyle*, 257 N. Y. 244). The statute begins with a declaration that 'when used in this chapter "committee" shall be deemed to refer to and mean the joint legislative committee of the senate and the assembly, appointed pursuant to the

joint resolution adopted by the senate and the assembly on March 23, 1931, to investigate, inquire into and examine the administration and conduct of the various departments of the government of the city of New York, and of the counties, the state and local courts, and other agencies geographically included within said city.' There is then a grant of authority to give immunity to witnesses who may be compelled to give testimony that would otherwise tend to expose them to punishment for crime. Here is an unmistakable recognition of the organization of the committee as established by the concurrent resolution and an unmistakable confirmation of its continuing validity. Mere incidents and details, not essential to the life of the investigating body, capacities and functions capable of being divested without destroying its existence, will not be held to have been confirmed by the appropriation of a sum of money, nor even, it may be, by the later grant of added powers. On the other hand, those terms of the resolution that define the essential organization of the investigating body, its birth and life and death, must be deemed to have been ratified by acts of recognition so explicit and persuasive.

"Holding, as we do, that the intention of the lawmakers was to confirm the existence of the committee as the concurring resolution had attempted to create it, there is left the question whether any rule of law exists whereby effect must be refused to the intention so declared. No such obstacle is disclosed to us by our examination of the precedents, nor does any become apparent from the principles that fix the limits of legislative power. No one would doubt the validity of a statute to the effect that whenever a legislative committee has been appointed in one year, its members, if re-elected, shall continue to constitute the committee during the next year, unless and until their membership is otherwise revoked. What the Legislature may say in a statute applicable to legislative committees generally, it may say with the same validity in defining the life and the functions of a particular committee. Far from departing thereby from the principles and precedents of parliamentary procedure, it is following the very method to which consecrating usage has affixed the stamp of regularity."

■ The legislative powers are vested in a Senate and House of Representatives and not in either separately; that is, the legislative power is vested in the legislature, which consists of a Senate and House of Representatives. Neither

the Senate nor the House of Representatives may, by independent action, create an investigating committee with power to sit after adjournment of the legislature.

The distinction between the attempt to create an interim committee by one House of the legislature, rather than by joint or concurrent action of the legislature, is presented in *Ex parte Caldwell*, 61 W. Va. 49, 55 S. E. 910, 10 L. R. A. (N.S.) 172. In that case, the supreme court of appeals of West Virginia held that a single House of the legislature was without power to create an interim committee to sit after adjournment of the legislature, but recognized the power of the legislature, by joint or concurrent action, to do so. The court said:

"The sole cause of Caldwell's arrest was his failure to appear before the committee as a witness. This presents a crucial question. Has the House of Delegates power, by its separate resolution, to raise a committee for such investigation to sit after the adjournment of the regular session of the Legislature? Section 1 of Art. 6 of the Constitution, says that, 'The Legislative power shall be vested in a Senate and House of Delegates.' Both branches constitute that body called The Legislature. The Legislature is directed by the Constitution to meet on a fixed day every two years, and the whole frame, spirit and provisions of the Constitution contemplate that acts of legislation shall be done by the two houses sitting at the same time. The two houses sit at the same time, neither having the power to adjourn over three days without the other. They meet in a session limited to 45 days, and when that limit comes it operates the dissolution of both houses, neither branch having any power to go on separately thereafter, nor has either body power to meet again alone. The Constitution contemplates that the power of the Legislature shall be exercised by the concurrence of the two houses. To make Legislative action operative in the future, whether by act or resolution, there must be the consent of the two houses. If the enactment is of such a character as to require an act, as distinguished from a resolution, then an act passed by both houses must be made; if the enactment or order is of such nature as it may be effected by resolution, it must be made by the joint action of both branches to operate after adjournment. When the powers of one branch are ended the powers of the other branch are ended. If we give effect after adjournment to

the mere resolution of one branch, it is in effect the continued power of that single branch. If the powers of that branch are at an end, the powers of a committee appointed by it are also at an end. The limb cannot exist after the body has perished. The agent or deputy cannot act after his principal is extinct. If the branch cannot act, how can a committee act deriving its life from the branch? There can be no question but that during the session one branch can appoint a committee alone to act during the session, because each body has power of action during the session to entertain bills, and may use a committee to investigate and report upon any matter which may come before it. Each branch can agree to or disagree in the action of the other branch. During the session it may have a committee to investigate and report to it. This is necessary to enable it to perform its part in the legislative function committed to both houses. The Congress of the United States is composed of a Senate and House of Representatives, and in those two branches the Federal Constitution vests all legislative powers granted by it, as our Constitution vests in the Legislature the legislative power of the State. There is no doubt of the power of either branch of Congress or Legislature to appoint a committee of investigation, without the concurrence of the other branch, to act during the session. *In re Chapman,* 166 U. S. 661; *Anderson v. Dunn,* 6 Wheaton 204; *Ex parte Dalton,* 44 Ohio St. 142. And there is no doubt that both branches of the Legislature can pass a joint resolution operative in future, after adjournment, to glean information for legislation, if a resolution is proper, just as they can pass an act. The passage of such a resolution, in a proper case, is no less a performance of a legislative function than the passage of an act, and it requires the dual consent. An act of one body, operative during recess, as for a statute, would be null, and so would a resolution. It cannot be doubted that by joint resolution a committee may be authorized to sit after adjournment. It may be asked, how does it come that both branches can pass a resolution to operate and be carried into effect after adjournment, while one branch is denied that power? There are two answers. One is, that both houses can pass an act to operate after adjournment, and both houses can pass a resolution to operate after adjournment, because they have the concurrent action of both branches, whereas the act or resolution of one house has not, and the Constitution plainly contemplates that no act or ordinance having legal force after adjournment shall be passed by one branch. The other

answer is, That the Legislature may meet again after adjournment whereas one house cannot alone meet. When the Legislature once adjourns neither house can meet again alone. We are cited to the case of *Commercial Bank v. Worth*, 117 N. C. 146, 23 S. E. 160, 30 L. R. A. 261, for the position that either house may appoint a committee to sit after adjournment. It does not so hold. It holds that a committee appointed by both branches cannot sit in vacation, unless authorized to sit after adjournment, but if so authorized, it may do so; but that refers to a resolution adopted by both branches and does not assert the power of one branch to pass a resolution appointing a committee to sit after adjournment, even if the resolution so authorized."

See, also, *Sullivan v. Hill*, 73 W. Va. 49, 79 S. E. 670, Ann. Cas. 1916B, 1115.

The 1897 session of the legislature of Kansas, by concurrent resolution, provided for an investigating committee, but the resolution did not expressly provide for a continuation of the activities of the committee following adjournment. The supreme court of Kansas, in *In re Davis*, 58 Kan. 368, 49 Pac. 160, held that, while the joint resolution did not expressly provide for a continuation of the activities of the committee subsequent to adjournment of the legislature, the legislature had power to authorize the committee to continue into the interim, and, if such an intent could be found, the committee would have authority to proceed. The court said:

"Two principal questions are presented for determination. The first is, whether the committee appointed under Senate concurrent resolution No. 26 has authority to act after the adjournment of the Legislature; the second is, whether it has power to imprison a witness for refusal to testify. The general rule undoubtedly is that the powers of committees of legislative bodies cease on the final adjournment of the body, unless express provision is made for their continuance; but that the houses of the Legislature have power to confer authority on a committee to continue its labors after adjournment, is not questioned. The concurrent resolution under which the committee claims the right to act contains no direction on the subject; and if the question were to be determined solely on the resolution itself, it would follow

that the committee is without power to proceed. But paragraph 95 of the act making appropriations for miscellaneous purposes, reads as follows:

" 'There is hereby appropriated, three thousand dollars to pay expenses of committee officers, clerks, stenographers, witnesses and other necessary expenses incurred in an investigation for bribery as recited in Senate resolution No. 26, or so much thereof as may be necessary: *Provided,* That said sum shall not be available if criminal prosecution shall be instituted in the District Court of Shawnee County on or before May 15, 1897; *and provided further,* That said investigation shall terminate when said sum of three thousand dollars shall be expended under penalty of forfeiture to the State treasury of the whole sum herein appropriated, and no part of this sum shall be available until the investigation shall be terminated and the aggregate expense submitted to the Auditor of State under oath of the committee of investigation; no mileage shall be paid in excess of five cents per mile, and the Auditor of State is hereby authorized to draw his warrants upon the Treasurer of State upon properly authenticated and detailed vouchers for the purposes above named in accordance with the conditions hereinbefore stated and when approved by the chairman of said committee.'

"This act was approved March 15, and appears as chapter 11 of the Laws of 1897. The clause quoted lacks much of being clear or explicit, but it seems to contemplate a session of the committee after the fifteenth of May, rather than before, and evidences intent on the part of the two houses that the committee should sit after final adjournment."

In the case at bar, it will be observed that, by § 8 of house concurrent resolution No. 10, the legislature expressly authorized the committee on un-American activities to sit after adjournment.

In *Commercial & Farmers' Bank v. Worth,* 117 N. C. 146, 23 S. E. 160, 30 L. R. A. 261, the supreme court of North Carolina recognized the power of the legislature to authorize a legislative committee to sit after adjournment of the legislature and to allow compensation to the members of the committee. The court said:

"Nor can it be denied that the legislature has power to authorize a committee of its body to sit during vacation and fix its compensation.

"The question before us does not turn upon the power of the legislature, which is undeniable, but upon the construction of their action. The uniform action of Congress and the legislature so far as our researches extend has been to expressly authorize such committee to 'sit in vacation.' Inasmuch as the existence of all committees in the absence of legislation necessarily determines upon the adjournment of the body to which they belong, certainly there must be an explicit enactment that the sessions of the committee can be held after such adjournment, or at least a clear unmistakeable implication to that effect from the words used in the act or resolution creating the committee. We do not find such to be the case here. The resolution (Laws 1895, p. 502) simply provides that the Committee 'shall find the facts from the evidence, and report said facts and also set out the evidence in full in said report, and make their report to the General Assembly, if it is possible to do so, before its adjournment,'—so far there is nothing to distinguish this committee from any other or to prolong its existence beyond the adjournment of the body to which it belonged. Then follow the only words which can be construed to give such power 'And if not, then said report shall be made to the Supreme Court.' This confers no power on the committee to do any act after the General Assembly should adjourn except to make their report if it should not be ready. There is no explicit provision or clear implication that the committee should take any other action. Had the legislature so desired, it would according to precedent have provided that the committee could sit in vacation, as they plainly provided that they could report in vacation, if necessary, which necessity seemed to be considered doubtful.

"When a committee is empowered to sit in vacation, the resolution must provide the compensation and for the expenses of the same, otherwise there is no authority of law for their payment.

" . . . The legislature had power to authorize the committee to sit in vacation and to allow compensation to the members of it. They chose not to do so."

In *Commonwealth v. Costello,* 21 Pa. Dist. Rep. 232, the court held that a committee may, by the joint or concurrent resolution of the two branches of the legislature, be authorized to continue its sessions after adjournment of the legislature, for the reason that the legislature as a whole is, in

general, the depository of all the legislative power originally possessed by the people of the commonwealth, except so far as these have been ceded to the United States by the national constitution, or withheld by express exception in the state constitution. The court said:

"It is settled law that a committee may, by the joint or concurrent resolution of the two branches of the legislature, be authorized and empowered to continue its sessions after the legislature's adjournment: *Branham v. Lange,* 16 Ind. 497; *In re Falvey,* 7 Wis. 630; *Commercial & F. Bank v. Worth,* 117 N. C. 146; *In re Davis,* 58 Kans. 368. This follows from the fact that the legislature, as a whole, is, in general, the depository of all the legislative power originally possessed by the people of the commonwealth, except so far as these have been ceded to the United States by the national constitution, or withheld by express exception in the state constitution.

"But, while the legislature as a unit is vested with whatever power of legislation has not been expressly denied to it, such is not the case with its constituent houses. Neither branch possesses any powers but those specifically granted to it by the constitution, and those powers implied as necessarily incident to the performance of its indicated functions in the general scheme of government: *State v. Guilbert,* 75 Ohio, 1.

"Even where, as in Pennsylvania, each house of the general assembly is clothed not only with the power to preserve order at its sessions, to control and discipline its members, and to provide against interference with them and their privileges through bribery, intimidation or violence, but also with 'all other powers necessary to the legislature of a free state' (Section 11, art. II, Constitution of Pennsylvania), it has never been supposed that the separate branches of the legislature have severally general legislative authority, or that, except in those particular cases defined by the constitution, their respective powers rise beyond what is requisite to enable each to perform the specific duty allotted to it in the work of legislation."

The foregoing authority points out the distinction between the limited power of one House and the unlimited power of the legislature. The power is recognized in the legislature unless, by some means, it is expressly restrained, but no power is recognized in a single House of the legisla-

ture unless express grant thereof to the legislature can be found. See *Brown v. Brancato*, 321 Pa. 54, 184 Atl. 89.

In January, 1947, the legislature of Alabama requested an advisory opinion of the supreme court of that state as to the constitutionality of a resolution pending before the committee proposing to create legislative interim committees. The court said, in *In re Opinion of the Justices*, 248 Ala. 591, 29 So. (2d) 10:

"In considering the power of the Legislature to appoint interim committees it should be borne in mind that legislative power is not derived either from State or Federal Constitution. These instruments are only limitations upon the power. Apart from limitations imposed by these fundamental charters of government, the power of the Legislature has no bounds and is as plenary as that of the British Parliament. . . .

"As we have observed, the Legislature has plenary power except when limited by the Federal or State Constitution. So far, therefore, as this constitutional amendment seeks to restrict the Legislature in the appointment of interim committees it should be strictly construed. *State v. Clements*, 220 Ala. 515, 126 So. 162. The power to legislate necessarily presupposes necessity for investigation by members of each House. This question was fully discussed in *McGrain v. Daugherty*, 273 U. S. 135, 47 S. Ct. 319, 71 L. Ed. 580, 50 A. L. R. 1, where the court held the practice of appointing legislative committees was a necessary power to the end that the functioning of lawmaking may be effectively exercised. To like effect see 49 Am. Jur. § 40, pp. 257, 258; *In re Southard*, 13 Cal. (2d) 497, 90 P. (2d) 308. . . .

"An interim committee does not legislate, it merely makes inquiry and obtains data so that it may properly report to the regular session their findings. This, in our opinion, is not doing business within the meaning of the constitutional provision above noted, but is merely in preparation to that end when the Legislature reconvenes in its regular session."

The question was considered by the supreme court of Tennessee in *Gilbreath v. Willett*, 148 Tenn. 92, 251 S. W. 910, 28 A. L. R. 1147. The court held that, under the constitutional provision which provides that every joint resolution or order shall be signed by the governor before it shall take effect, a resolution appointing a committee with

power of investigation, which resolution was not signed by the governor, is void and affords no authority to those attempting to act under it. In holding that the committee had no power to function following adjournment of the legislature, the court said:

"We do not think it necessary to decide whether the legislature could, by anything short of an act duly passed, create a committee of this nature with power to function after the adjournment of the legislature *sine die.*

"What we now decide is that the resolution under consideration, being legislative in its nature, is, by reason of the absence of the governor's signature, unconstitutional, null, and void, and affords no authority to those attempting to act under it."

The foregoing case is distinguishable from the case at bar, in view of the fact that the constitution of this state does not require the signature of the governor to joint or concurrent resolutions making effective the investigatory power of the legislature following adjournment.

The legislature of Texas, by concurrent resolution, created a tax-study commission to function during the interim. The supreme court of Texas, in *Terrell v. King,* 118 Tex. 237, 14 S. W. (2d) 786, affirmed the power of the legislature to function in the interim, as a body of inquiry and investigation. It will be noted that the joint resolution was approved by the governor, hence reflects the will of the state in one of the modes prescribed by the constitution, and is, therefore, as binding as a statute.

In *In re Hague,* 104 N. J. Eq. 369, 145 Atl. 618, the court of errors and appeals, which is the highest court of the state of New Jersey, affirmed the power of an interim committee, created by joint resolution, to sit following adjournment of the legislature which created the committee. This is a decision on appeal from an order advised by Vice Chancellor Fallon, whose opinion is reported in *In re Hague,* 104 N. J. Eq. 31, 144 Atl. 546. The opinion of Vice Chancellor Fallon in the court of chancery, which is not the court of last resort in New Jersey (105 N. J. Eq. 134, 147 Atl. 220), is contrary to the opinion of New Jersey's court of last resort. Vice Chancellor Fallon was of the view that the joint resolution

creating the interim committee was invalid. His opinion is in conflict with that of the court of appeals of New Jersey in *In re Hague*, 104 N. J. Eq. 369, 145 Atl. 618, that the joint resolution was a valid exercise of legislative power.

In *Swing v. Riley*, 13 Cal. (2d) 513, 90 P. (2d) 313, the supreme court of California held that the legislature is without power by concurrent resolution, to create a committee with power to sit after adjournment *sine die*; that if an interim committee, appointed by the legislature, is to function lawfully after adjournment of the legislature, it can be created only by statute. The court expressed the further opinion that, under the California constitution, the legislature has no power by concurrent resolution to create a committee to sit after adjournment of the legislature *sine die,* and as far as the question of power is concerned, there is no difference in this regard between the single House and a concurrent resolution. The California supreme court conceded that there is a conflict of authority on this subject.

This case cannot be distinguished. However, we are not inclined to follow it. The supreme court of California lost sight of the principle that, if the power to investigate by statutory committee be conceded, then the power to act through joint resolution should operate under the doctrine of reserved power, unless there is some express restriction. See, also, *Parker v. Riley*, 18 Cal. (2d) 83, 113 P. (2d) 873, 134 A. L. R. 1405, and *Special Assembly Interim Committee v. Southard*, 13 Cal. (2d) 497, 90 P. (2d) 304.

In *Dickinson v. Johnson*, 117 Ark. 582, 176 S. W. 116, L. R. A. 1915E, 496, the supreme court of Arkansas held that interim committees, with authority to function after adjournment *sine die,* could be created only by formal legislative enactment and not by joint resolution. That court fails to recognize the doctrine that the sovereign, or reserved, power is in the legislature. For the reason that it finds no authority in the constitution of Arkansas, the court denies the power. We cannot agree with that philosophy. The court said:

"Under our Constitution, the Legislature has no power, *by concurrent resolution,* to appoint committees or to con-

tinue committees already appointed for the purpose of making investigations after the Legislature has adjourned. The principle controlling this question was announced by this court in *Tipton v. Parker,* 71 Ark. 193-196. There the question was as to whether the Senate had authority to direct a committee to make certain investigations after the adjournment of the Legislature and report its findings to the Governor. In that case we said: "The committee, being the mere agency of the body which appointed it, dies when the body itself dies, unless it is continued by law; and it is not within the power of either house of the General Assembly to separately enact a law, or pass a resolution having the force and effect of a law. To do this requires a majority of each house voting in its favor. Const. 1874, art. 5, sec. 23.

" 'The only legitimate office, power or duty of a committee of the Senate, in the absence of a law, prescribing other functions and duties, is to furnish the Senate which appointed it with information, and to aid it in the discharge of its duties.'

"It was there distinctly ruled that the committee dies when the body creating it dies, unless the committee is continued by law. The court, by the language used in that case, did not mean to hold or indicate, even by indirection, that a committee of the Legislature could be continued by a concurrent resolution beyond the adjournment *(sine die)* of the Legislature. While the writer is the only member of the present court who participated in that decision, yet the majority of us concur in the view therein expressed, that to continue or appoint a committee whose work of investigation is to go on beyond the session of the body which created it, requires the enactment of a law by bill, passed in the manner prescribed by the Constitution.

"The principle announced in *Tipton v. Parker, supra,* and here reiterated, is not only sound, but it is supported by the weight of authority in this country having Constitutions similar to our own."

*Dickinson v. Johnson, supra,* lends no support to the contention of respondent. It relies for sustaining authority on *Tipton v. Parker,* 71 Ark. 193, 74 S. W. 298, which held that neither house of the general assembly, by separate resolution, has the power to create interim committees to sit after the final adjournment of the legislature. The difference between a resolution of a single House and a joint, or concurrent, resolution is vital.

In *Fergus v. Russel,* 270 Ill. 304, 110 N. E. 130, Ann. Cas. 1916B, 1120, the supreme court of Illinois held that a committee appointed by joint resolution of the general assembly for performing duties after the *sine die* adjournment of the legislature, is without authority to act. The only supporting authority cited is *Tipton v. Parker,* 71 Ark. 193, 74 S. W. 298, which held that a *single* House of the legislature is without power to create interim committees.

There is a fundamental difference between a bill or act and a resolution. The first may eventually become a law. For that reason, its introduction and passage are circumscribed by definite and positive constitutional regulations. Its title must conform to a certain style (Art. II, § 18, state const.). It may not embrace more than one subject, and that subject must be expressed in the title (Art. II, § 19). It may originate in either house (Art. II, § 20), but it must be passed by a majority of the members elected to each house by a "Yea" and "Nay" vote (Art. II, § 22). It may be amended in either house (Art. II, § 20), but no amendment may change its scope or object (Art. II, § 38). It must be signed by the presiding officer of each house (Art. II, § 32). When the bill has passed the legislature, it becomes an act. It is not a condition precedent to it becoming a law that it be signed by the governor, but it must be presented to the governor (Art. III, § 12). Whether the governor approves it, may become immaterial. The legislature may pass it over his veto by a two-thirds majority of those present in each House.

Exacting restrictions are placed by the constitution upon the power of the legislature to enact laws, but no restrictions are placed by the constitution upon the power of the legislature to investigate and inquire; that is, the power inheres in the legislature to establish its own methods for conducting inquiries.

In 1919, the Washington state legislature, by joint resolution, ratified the proposed prohibition amendment to the Federal constitution. The secretary of state refused to receive a petition to refer the ratification resolution to the people on the ground that the amendment, having been

adopted by a joint resolution and not by an act, bill, or law, was not within the terms of the seventh amendment and, therefore, was not subject to referendum. We said, in *State ex rel. Mullen v. Howell,* 107 Wash. 167, 181 Pac. 920:

"The contention that a resolution, although it may have the force and consequence of a formal legislative enactment and affect the people in their civil and political rights, cannot be referred arises from a misconception of the term. This case sounds in fundamentals, not in definitions. It is not the resolution, but the *act* of the legislature in adopting it that is to be referred. A resolution, like all acts of the legislature, is to be measured by the end accomplished. It is true that we have no provision in our constitution providing for the passage of resolutions, even in the formal matters in which the legislature has throughout the entire history of our territory and state been wont to act, but it is just as evident that there is no limitation upon the power of the legislature to act by resolution."

In the case at bar, the legislature acted by adopting a concurrent resolution and setting up a committee. There is no constitutional restriction upon that method of action when touching the inherent investigating power of the legislature.

1 Cooley's Constitutional Limitations (8th ed.) (Carrington) 345:

"The rule of law upon this subject appears to be, that, except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the law-making power; [nor can it consider the motive which inspired the passage of a statute in determining the question of its validity.] Any legislative act which does not encroach upon the powers apportioned

to the other departments of the government, being *prima facie* valid, must be enforced, unless restrictions upon the legislative authority can be pointed out in the Constitution, and the case shown to come within them."

The concurrent resolution of the 1947 legislature which created the interim committee on un-American activities was an authorized act of the legislative body, and it is effective for the purposes for which it was adopted.

By that resolution, the legislature provided, as it had the inherent power to provide, for payment of expenses of the members of the committee from moneys appropriated by Laws of 1947, chapter 1, for the expenses of the legislature.

No other questions of substantial merit are presented.

Let the writ issue.

BEALS, STEINERT, JEFFERS, and HILL, JJ., concur.

SCHWELLENBACH, J. (dissenting)—In order to better explain my position, I am quoting certain sections of the state constitution, which have already been quoted by the majority.

Art. II, § 1, provides:

"The legislative powers shall be vested in a senate and house of representatives, which shall be called the legislature of the state of Washington."

Art. II, § 12, provides:

"The first legislature shall meet on the first Wednesday after the first Monday in November, A. D. 1889. The second legislature shall meet on the first Wednesday after the first Monday in January, A. D. 1891, and sessions of the legislature shall be held biennially thereafter, unless specially convened by the governor, but the times of meeting of subsequent sessions may be changed by the legislature. After the first legislature the sessions shall not be more than sixty days."

The biennial sessions of the legislative branch of the state government are thus limited to sixty days. When any such session of the legislature adjourns *sine die*, its functions, as the legislative branch of the government, entirely cease. Its members lose all powers as legislators; true, they are still

senators and representatives, entitled to hold their offices during the remainder of the two- or four-year terms for which they were elected, but they are senators and representatives without any power to act as such. They cannot make laws; they cannot reconvene, unless called into special session by the governor; they cannot perpetuate themselves in power; they cannot, unless by an *act* of the legislature, appoint committees to serve subsequent to adjournment. The adjournment *sine die* ends their labors for that particular session. The constitutional provision above quoted, prohibits their subsequent functioning. It is an express limitation upon their right to subsequently function. A man may lock his safe by closing the door and twisting the dial. Five minutes later, by manipulating the dial to the proper combination, he may reopen the safe. But if there is a time lock on the safe, he cannot reopen it until the time set on the time lock. The adjournment *sine die* closes the legislative session. The constitutional provision limiting that session to sixty days, prohibits that particular session from ever reconvening. It is a limitation and a prohibition on the right of that legislative session to again function as such.

House concurrent resolution No. 10 was adopted by the thirtieth session of the Washington legislature. The thirtieth session convened January 13, 1947 and adjourned *sine die*, March 13, 1947. There is no question but that the reason it adjourned March 13th was because that date happened to be the sixtieth day subsequent to its convening, on January 13th. Art. II, § 12, *supra,* provides: "After the first legislature the sessions shall not be more than sixty days."

Chapter 1, section 1, of the thirtieth session provided:

"There is hereby appropriated out of the general fund of the State of Washington the sum of four hundred seventy-five thousand dollars ($475,000), or so much thereof as may be necessary, to be used for the purpose of paying the expenses, except legislative printing, of the Thirtieth Legislature of the State of Washington."

It will thus be seen that so much as might be necessary of the sum of $475,000 was appropriated for the purpose of paying the expenses of the thirtieth legislature. When the

thirtieth legislature adjourned *sine die* March 13, 1947, any moneys remaining unexpended for the purposes of that session, reverted back to the general fund. The *act* creating the state legislative council, approved by this court in *State ex rel. Hamblen v. Yelle,* 29 Wn. (2d) 68, 185 P. (2d) 723, provided that the expenses of the council might be drawn upon funds appropriated for legislative purposes. There was thereby a reappropriation of so much of this $475,000 fund as was necessary for the purposes of the council, *by an act of the legislature itself.* Here the funds were attempted to be provided by joint resolution. Such an attempt was invalid.

*Amici curiae,* by an appendix to their brief, furnished a list of states having constitutional limitations to legislative sessions, taken from the Index Digest of State Constitutions Prepared for the New York State Constitutional Convention Committees, by the Legislative Drafting Fund, of Columbia University. That list follows:

40  days, Wyoming, III 6;

45  days without the concurrence of two-thirds of the members elected to each house, West Virginia, VI 22;

50  days, Alabama, IV 48;

50  days unless an impeachment trial pending at the end of that period, Georgia, III Sec. IV 3;

60  days (except special sessions), Nebraska, III 4;

60  days, Louisiana, 23; Montana, V 25; Nevada, IV 29; New Mexico, IV 5; Washington, II, 12;

60  days, but with concurrence of three-fifths of members elected to each house may be extended not exceeding 30 days, Virginia, IV 46;

60  days unless two-thirds vote of members elected to each house (not applied if impeachment pending) Arkansas, V 17;

60  days exclusive of Sundays and legal holidays, not applicable when sitting as court of impeachment, Kentucky, 42;

60  days except in cases of impeachment, North Dakota, II 56; South Dakota, III 6; Utah, VI 16;

61  days, Indiana, IV 29;

90  days, Colorado, V 6; Maryland, III 15;

90  legislative days, Minnesota, IV 1.

In addition to the above, Art. II, § 4, of the constitution of Pennsylvania, provides:

"The General Assembly shall meet at twelve o'clock, noon, on the first Tuesday of January every second year, and at other times when convened by the Governor, *but shall hold no adjourned annual session after the year one thousand eight hundred and seventy-eight.* In case of a vacancy in the office of United States Senator from this Commonwealth, in a recess between sessions, the Governor shall convene the two Houses, by proclamation on notice not exceeding sixty days, to fill the same." (Italics mine.)

*Brown v. Brancato,* 321 Pa. 54, 184 Atl. 89, was an action to restrain a committee appointed by the Pennsylvania house of representatives from investigating a board of city trusts. The general assembly adjourned *sine die* June 21, 1935, and demand was made by the committee on September 5, 1935, for access to the records, books, and accounts of the trust. The court held:

"Legislative power is vested in the General Assembly composed of the Senate and the House of Representatives: Article II, section 1, PS, Constitution, page 176. Members of the Senate are elected for four years, members of the House for two years: Article II, section 3. The Assembly shall meet in regular session on the first Tuesday of January every second year and at other times when convened by the Governor, but no adjourned annual session shall be held: Article II, section 3. No power is vested in the House to act independently of the Senate after the Assembly adjourns sine die. The Constitution contemplates the exercise of Legislative power by concurrence of both House and Senate. *The legislative action of the General Assembly, in virtue of the session which convened, as required by Article II, section 3, ended with its adjournment.* After adjournment the power of this committee of the House, if it had any power before, was effectually ended. There is no implied power in the exercise of which the House may sit after adjournment of the Assembly and therefore no power in the House to create a committee to do what the House itself may not do. From and after the adjournment, the power of the House complained of in this suit, was done once and for all." (Italics mine.)

The precise issue in that case was the power of one house to act subsequent to the adjournment of the assembly, but

the principle that the legislature had no power to function after adjournment, was clearly stated.

The majority quotes from *Ex parte Caldwell,* 61 W. Va. 49, 55 S. E. 910, 10 L. R. A. (N.S.) 172, where it was held that one branch of the legislature alone had no power to create an interim committee to sit after adjournment, but recognized the power of both houses to do so. At the time that opinion was rendered, the West Virginia constitution provided that no session should continue longer than forty-five days, without the concurrence of two thirds of the members elected to each house. In answer to the question as to why both branches could pass a resolution to operate after adjournment, the court, in the *Caldwell* case said: *"The other answer is that the legislature may meet again after adjournment."* (Italics mine.)

Art. VI, § 19, of the West Virginia constitution provides:

"The Governor may convene the Legislature by proclamation whenever, in his opinion, the public safety or welfare shall require it. *It shall be his duty to convene it, on application in writing, of three-fifths of the members elected to each House."* (Italics mine.)

It will thus be seen that the legislature has a right to reconvene after adjournment and is not limited to its forty-five day sessions.

In ruling on a writ of *habeas corpus* sued out by Frank Hague, Vice Chancellor Fallon, in *In re Hague,* 105 N. J. Eq. 134, 147 Atl. 220, said:

"The legislative power vests in a senate and general assembly. *State Const., art. 4 § 1 Par. 1.* Said bodies meet separately on the second Tuesday in January, at which time of meeting the legislative year commences. *State Const., art. 4 § 1 Par. 3.* Neither of said bodies are continuous; they expire annually. *State v. Rogers, 56 N. J. Law 480 (at p. 631).* Although the senate—providing an always-existent membership—may be considered as having a permanent existence, it does not have continuous vitality. *State v. Rogers, supra (at p. 622).* It is only when the senate and general assembly are lawfully assembled that they constitute the legislature—the law-making body of the state. Each of said bodies are subject, in their action, to constitutional limitations and laws, in common with all other

bodies, officers and tribunals within the state. *In re Gunn, 50 Kan. 155; 19 L. R. A. 519; Kilbourn v. Thompson, 103 U. S. 168; Burnham v. Morrissey, 80 Mass. 226.* All powers of the legislature, as such, cease upon the final adjournment of said body. All powers delegated to a committee appointed by a joint resolution of the senate and general assembly also cease. *Fergus v. Russel, 270 Ill. 304, 343, 344; Bank v. Worth, 117 N. C. 146.* The legislative committee appointed under the aforesaid joint resolution had no authority after the final adjournment of the 1928 legislative session, except to make a report. *Bank v. Worth, supra.* The legislature constituted for the year 1929 was without power to amend or supplement the aforesaid joint resolution. The power of the legislature is distinguishable, in this respect, from its conceded authority to amend or supplement a law. A joint resolution adopted by a state legislature is not a law. It is of less solemnity than a law, and clearly distinguishable therefrom."

The majority questions this decision as being in conflict with an earlier opinion of the highest court of New Jersey. Here is the history of this litigation.

The 1928 legislature, by joint resolution No. 13, appointed an investigating committee. The 1929 legislature amended the 1928 resolution. On April 18, 1929, the court of errors and appeals in *Ex parte Hague,* 104 N. J. Eq. 369, 145 Atl. 618, in a per curiam opinion, answered certain questions submitted to it, among which was:

"Is joint resolution No. 13, taken as a whole, a valid exercise of legislative power, even if some one or more of the inquiries suggested therein may be unlawful?"

That question was answered in the affirmative.

Upon Hague's failure to answer certain questions submitted by the committee, he was arrested. He then applied to Vice Chancellor Fallon for a writ of *habeas corpus.* August 27, 1929, Fallon, vice chancellor, in the above-quoted case, in deciding whether joint resolution No. 13 had any vitality after the final adjournment of the legislature, rendered the above opinion in *In re Hague,* 105 N. J. Eq. 134, 147 Atl. 220, and discharged the petitioner.

On May 19, 1930, in *Ex parte Hague,* 9 N. J. Misc. 89, 150 Atl. 322, upon appeal, the court of errors and appeals af-

firmed the order of Fallon, vice chancellor, rendered August 27, 1929.

The majority quotes from the Alabama case, *In re Opinion of the Justices*, 248 Ala. 591, 29 So. (2d) 10, decided January 18, 1947. An amendment to the Alabama constitution had been ratified November 5, 1946, providing that the legislature should convene on the second Tuesday in January, next succeeding their election, and should remain in session for not more than ten consecutive days, at which session no business could be transacted except the organization of the legislature and work incidental thereto. A request was made for an advisory opinion as to the constitutionality of a joint resolution proposing to create six interim committees *"to serve during the interim between this organizational session of the legislature and the Regular Session of the Legislature to be held in May, 1947."* There could be no question but that these interim committees were legal, because they were operating as a part of the 1947 session of the legislature.

In every state having a constitutional limitation similar to ours, in which the question of the constitutional right to appoint, by joint resolution, an interim committee with power to function subsequent to the adjournment *sine die* of the legislature, has been presented, such right has been denied.

The majority has cited cases from a number of states, not having any constitutional limitation on the length of legislative sessions, which have approved the right of the legislature to appoint interim committees with power to serve after adjournment. However, of those states, Texas, Kansas, Tennessee, and North Carolina have constitutional provisions requiring that resolutions be treated in the same manner as bills. In those states, resolutions have the same solemnity as acts of the legislature.

The majority states that the question whether the legislature may project its *investigatory* function into the interim and until the next session of the legislature is foreclosed by our opinion in *State ex rel. Hamblen v. Yelle*, 29 Wn. (2d) 68. The only question before us in the *Hamblen*

case was whether or not members of the legislative session which created *by an act of the legislature,* the "State Legislative Council," with authority to function after the adjournment of the legislative session, could serve on such council. *The right of the legislature to appoint interim committees by joint resolution was not before us.* We should be extremely careful not to enlarge our previous holdings in subsequent decisions.

In *Dickinson v. Johnson,* 117 Ark. 582, 176 S. W. 116, L. R. A. 1915E, 496, the Arkansas court was considering the following question: "Did the General Assembly have power, by concurrent resolution, to continue its committees for the purposes expressed in the resolutions, after the adjournment *sine die?*" In answering the question in the negative, the court said:

"For the purpose of obtaining information looking to the enactment of laws to meet the requirements of Government, the appointment of committees by either branch of the Legislature, or by the concurrent action of both branches, is absolutely necessary for the efficient discharge of legislative functions, and is recognized under our systems of Government, both State and National. Ordronaux Constitutional Legislation, p. 373.

"When such resolutions are constitutionally adopted concerning a subject-matter within the proper sphere for such resolutions they may have the force and effect of a law. Our own Constitution has recognized concurrent resolutions as one form in which the Legislature may express its will, and when it is expressed in the manner prescribed, and concerning those matters within the legitimate scope of concurrent resolutions, such resolutions may have the force and effect of law. Yet they were not regarded by the framers of our Constitution as of the same dignity and importance as a bill. The same solemnity and strictness is not required for the adoption of resolutions, as is to be observed in the passage of bills, except when the resolutions are disapproved by the Governor. Const. of Ark., art. 6, sec. 16. Concurrent resolutions are necessary, but have the force and effect of law only within the limited sphere incident to the work or legislation which the Legislature may complete before its final adjournment.

"In congress a joint resolution is regarded as a bill. See Cushing's Law and Practice of Legislative Assemblies, p.

93. And in many of the States joint resolutions are recognized as equivalent to laws enacted by bill. See *State ex rel. Peyton v. Cunningham,* 18 Am. & E. Ann. Cas., p. 707, case note.

"But such is not the case under our Constitution. [quoting constitutional provisions.] . . .

"*Thus a clear distinction is made between bills and concurrent resolutions. The one can not take the place of the other. All laws must be passed by bill. Concurrent resolutions can not be used to enact laws.*

" . . .

"As the only efficient method of making the investigation and procuring the information desired, the General Assembly, by concurrent resolution, appointed its committees, and these committees reported that they were not able to complete their work and make report before the time for the expiration of the session under the Constitution. The committees were the agencies of the General Assembly which created them, and so long as the Legislature was in session, it had full control over them. When it became apparent near the close of the session that the committees would not have time to make the investigation and procure the information contemplated for the purposes of any present legislation it was not only within the power of the Legislature, but was a proper exercise of that power, for it to continue the work of the investigation for the information of the Governor and the people generally, and as a guide for any future legislation that might be necessary. *But this continuation or reappointment of the committees for the important work outlined for them after the adjournment of the Legislature was not a proper subject-matter for concurrent resolution. It could only be done by a bill enacting a law to that effect.*

"Under our Constitution, the Legislature has no power, *by concurrent resolution,* to appoint committees or to continue committees already appointed for the purpose of making investigations after the Legislature has adjourned. The principle controlling this question was announced by this court in *Tipton v. Parker,* 71 Ark. 193-196. There the question was as to whether the Senate had authority to direct a committee to make certain investigations after the adjournment of the Legislature and report its findings to the Governor. In that case we said: 'The committee, being the mere agency of the body which appointed it, dies when the body itself dies, unless it is continued by law; and it is not within the power of either house of the General

Assembly to separately enact a law, or pass a resolution having the force and effect of a law. To do this requires a majority of each house voting in its favor. Const. 1874, art. 5, sec. 23.

" 'The only legitimate office, power or duty of a committee of the Senate, in the absence of a law, prescribing other functions and duties, is to furnish the Senate which appointed it with information, and to aid it in the discharge of its duties.'

"It was there distinctly ruled that the committee dies when the body creating it dies, unless the committee is continued by law. The court, by the language used in that case, did not mean to hold or indicate, even by indirection, that a committee of the Legislature could be continued by a concurrent resolution beyond the adjournment (*sine die*) of the Legislature." (Italics mine.)

The majority criticizes this opinion because it relies for sustaining authority on *Tipton v. Parker,* 71 Ark. 193, 74 S. W. 298, which held that neither house, by separate resolution, has power to create interim committees to sit after adjournment. However, the court, in the *Dickinson* case, approved the principle outlined in the *Tipton* case, saying:

"While the writer is the only member of the present court who participated in that decision, yet the majority of us concur in the view therein expressed, that to continue or appoint a committee whose work of investigation is to go on beyond the session of the body which created it, requires the enactment of a law by bill, passed in the manner prescribed by the Constitution.

"*The principle announced in Tipton v. Parker, supra, and here reiterated, is not only sound, but it is supported by the weight of authority in this country having Constitutions similar to our own.* See *State ex rel. Peyton v. Cunningham,* 18 A. & E. Ann. Cas. 705, and authorities cited in note.

"In jurisdictions where the Constitution expressly recognizes joint resolutions as equivalent to laws enacted by bill, such resolutions, when duly passed under the Constitution, are given the force and effect of laws. Such is the case under the Constitution of the United States and some of the States. As a fair illustration of this may be mentioned *Olds v. State Land Commissioner,* 134 Mich. 442, 86 N. W. 956. There the Constitution provides: 'Every bill and joint resolution shall be read three times in each house before final passage thereof. No bill or joint resolu-

tion shall become a law without the concurrence of a majority of all the members elected to each house.' Of course, under such constitutional provision a concurrent resolution, when constitutionally passed, becomes a law the same as a law enacted by bill. But, as we have already observed, under a Constitution like ours, a concurrent resolution duly passed is not a law, and can not be used as a substitute for a bill. *Mullan v. State,* 114 Cal. 578-587; *Lithographing Co. v. Henderson,* 18 Col. 259; *Boyers v. Crane, Auditor,* 1 W. Va. 176; *May v. Rice,* 91 Ind. 546. See, also, *Hiram B. Burritt v. Commissioners of State Contracts,* 120 Ill. 322." (Italics mine.)

*In Fergus v. Russel,* 270 Ill. 304, 110 N. E. 130, Ann. Cas. 1916B, 1120, the court said:

"With the sine die adjournment of the Legislature all its functions as a legislative body cease. Its work is ended. It will not again be called into existence, except on the call of the chief executive for a special purpose, and no presumption will be indulged that it will be again so called into being. During the sessions of the Legislature either house may appoint separate committees, and the two houses, acting concurrently, may appoint joint committees for any proper purpose, which may exercise such powers as the house or houses appointing them may lawfully delegate or impose. The only powers which can be conferred upon and delegated to such committees are such powers as are possessed by the house or houses making the appointment. As all the powers of the Legislature, as such, cease upon its final adjournment, it must follow that all the powers which have been delegated by it, or either house thereof, to a committee by mere resolution cease also. In *Tipton v. Parker,* 71 Ark. 193, 74 S. W. 298, it was held that neither house of the General Assembly, by separate resolution, has the authority to appoint a committee to make any investigation after the final adjournment of the Legislature. *We perceive no reason why the holding in that case, of which we approve, should not apply to a joint resolution of both houses appointing such committee.* Such committees may be appointed, and they may act and may lay before the succeeding General Assembly the result of their investigations, but in so doing they are acting under no authority, but by mere request, and they have no authority delegated to them which they may exercise. In such a case the act is not that of a committee authorized by the Legislature or either house thereof, but is the voluntary

act of mere private individuals. The Legislature has no power to make an appropriation to pay the expenses of such persons who may thus voluntarily perform services, even though same may be performed at the request of the Legislature. The expenses so incurred are the private and individual debts and liabilities of such persons. Section 20 of article 4 of our Constitution provides:

" 'The state shall never pay, assume or become responsible for the debts or liabilities of, or in any manner give, loan or extend its credit to or in aid of any public or other corporation, association or individual.' " (Italics mine.)

In *Swing v. Riley*, 13 Cal. (2d) 513, 90 P. (2d) 313, the court said:

" 'Another and complete answer to this contention is that we are of the opinion that under our Constitution the legislature has no power by concurrent resolution to create a committee with power to sit after adjournment *sine die*. As far as the question of power is concerned there is no difference in this regard between a single house and a concurrent resolution. It is true that on this subject there is a conflict of authority. The cases both ways are noted in the assembly committee case, L. A. No. 16753 (*ante*, p. 497 [90 Pac. (2d) 304]). As was pointed out in the assembly committee opinion, *several of the cases holding that by a concurrent resolution the legislature may validly create an interim committee, are in fact not authority for that holding, for the reason that in the particular jurisdiction there is no legal distinction between a concurrent resolution and a statute, both requiring the governor's signature.* The reasoning of the several cases holding that a concurrent resolution is ineffectual to validly create such a committee seems to us to be unanswerable. If such a committee cannot lawfully be created by single house resolution (and on this point all state courts agree) it cannot be created by concurrent resolution. Every argument fully set forth in the assembly committee case, L. A. No. 16753 (*ante*, p. 497 [90 Pac. (2d) 304]) is equally applicable here. Legislative powers of the legislature cease upon adjournment *sine die*. *Such powers cannot be continued after adjournment by either single house or concurrent resolution. The power to investigate by committees is subsidiary to the legislative power. When the main power ceases, the auxiliary power dies with it. If such committee or commission is to function lawfully after adjournment it can be created only by statute.*' " (Italics mine.)

Finally, the majority contends that the concurrent resolution adopted was an *act* of the legislature, and therefore valid, relying upon *State ex rel. Mullen v. Howell*, 107 Wash. 167, 181 Pac. 920. There, the 1919 legislature, by joint resolution, ratified the eighteenth amendment to the Federal constitution. Application was made to refer the matter to the people under the seventh amendment to the Washington constitution, and this court held that, although the proceeding was designated as a joint resolution, it was, in fact, the *act* of the legislature by which it ratified the eighteenth amendment. For that reason, the court allowed the matter to be referred.

The rule in the *Howell* case has never been extended. On March 27, 1947, application was made to this court to refer, under the seventh amendment, this identical house concurrent resolution No. 10, now being considered by us. Relators in that proceeding claimed that under the authority of the *Howell* case a concurrent resolution was an act. By order issued April 11, 1947, we denied the petition. This precise issue has been determined by this court. By no process of legal reasoning can the concurrent resolution under consideration be considered an *act* of the legislature.

The constitution prohibits the legislature, as such, from functioning after the adjournment of its regular session, *sine die,* by and through a committee appointed by concurrent resolution.

The writ should be denied.

Mallery, C. J., concurs with Schwellenbach, J.

Simpson, J. (dissenting)—I am not unmindful of the merits of the objectives sought by the joint resolution which is under consideration in this case. However, the merits of the resolution afford no ground for abandoning our system of constitutional government, and having recourse to arbitrary measures not authorized by the constitution of this state.

I concur in all that Judge Schwellenbach has said in his dissent, except that portion which states that the legislature made a reappropriation for the expenses of the state

legislative council. This additional dissent is written for the purpose of pointing out that the manner in which the majority of this court interprets our constitution allows the legislature to drift away from its constitutional moorings and enter into a practice of accomplishing by indirection that which it cannot accomplish by direction.

The experience of the past has shown that the natural tendency and the usual result of evading the evident purpose and intent of the framers of our constitution, is to deprive the people of the protection given by the constitutional provisions. Our constitution is a tablet upon which the people have written their will, and they have expressed their determination that their will shall never be changed, save in the manner they have appointed. To put it in another way, our constitution is complete in itself, to which no addition can be made, and from which no declaration can be taken, except by a specific amendment, pursuant to a special provision of that instrument.

In determining the meaning of the provisions of the constitution, we should not depart from the usual meaning of words and phrases, or of language in general, in search of a rule to accommodate a present desirable accomplishment; for to do so will result in adding to, or subtracting from, the basic law, and will result in an instrument remade by judicial interpretation.

Judge Cooley, in his work on Constitutional Limitations (5th ed.) 156, says:

"It is a necessary attribute of sovereignty that the expressed will of the sovereign is law; and while we may question and cross-question the words employed, to make certain of the real meaning, and may hesitate and doubt concerning it, yet, when the intent is made out, it must govern, and it is idle to talk of forms that should have surrounded the expression, but do not. But when the legislative power of a State is to be exercised by a department composed of two branches, or, as in most of the American States, of three branches, and these branches have their several duties marked out and prescribed by the law to which they owe their origin, and which provides for the exercise of their powers in certain modes and under certain forms, there are other questions to arise than those of

the mere intent of the law-makers, and sometimes forms become of the last importance. For in such case not only is it important that the will of the law-makers be clearly expressed, but it is also essential that it be expressed in due form of law; since nothing becomes law simply and solely because men who possess the legislative power will that it shall be, unless they express their determination to that effect, in the mode pointed out by the instrument which invests them with the power, and under all the forms which that instrument has rendered essential."

And in the well-considered case of *State v. Platt,* 2 S. C. 150, 16 Am. Rep. 647, we find it said:

"Under the Constitution, the question whether an Act of legislation has the force of law, does not depend merely upon the constitutional majorities of the two Houses having so determined, but upon the performance of certain acts, in part legislative and in part executive, and following each other in a certain order. By Section 21, Art. II, it must have been read three times, and on three several days, in each House; it must have the Great Seal of the State affixed to it, and it must be signed in the Senate-House by the President of the Senate and the Speaker of the House of Representatives. By Section 22, Article III, it must have been presented to the Governor, and have been approved and signed by him. But the Governor's signature is not indispensable. If after being returned with his objections, it shall have been reconsidered and approved, in each House, by two-thirds of such House, or if, after being presented for his approval, he shall neither approve it nor return it with his objections, within three days—when these prerequisites are complied with, the Act acquires the force of law under the terms of the Constitution. If either one fails, there cannot be a compliance with the conditions upon which, under the express terms of the Constitution, the force of the Act, as law, depends."

In considering a proposition such as presented here, we should pay heed to the constitutional admonition contained in Art. I, § 32, of our state constitution itself:

"FUNDAMENTAL PRINCIPLES.—A frequent recurrence to fundamental principles is essential to the security of individual rights, and the perpetuity of free government."

Our system of constitutional government is well explained in the following paragraph from *Kilbourn v. Thompson,* 103 U. S. 168, 26 L. Ed. 377:

"It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. *It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other.*" (Italics mine.)

Continuing the elucidation, this court stated in *Blanchard v. Golden Age Brewing Co.,* 188 Wash. 396, 63 P. (2d) 397:

"The constitution of this state, modeled upon the supreme law of the land, has 'blocked out with singular precision, and in bold lines' the distribution and limitation of governmental powers to the executive, legislative, and judicial departments of the state, respectively. The legislative powers are vested in the two bodies composing the legislature, with the power of initiative and referendum reserved to the people. Art. II, § 1 (seventh amendment). The executive department consists of the governor and a number of elective officials, Art. III, § 1, but with supreme executive power vested in the governor. Art. III, § 2."

While not expressly included in the constitution of this state, the concept of government as provided by our three co-ordinate departments of government, is well stated in the Massachusetts constitution of 1780, Art. XXX, § 31:

"In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

In order to ascertain the powers of the legislature, it is necessary to bring to mind many of the provisions of our basic law.

Art. II, § 19, provides that no bill *shall embrace more than one subject, and that shall be embraced in the title.*

In Art. II, § 23, we find:

"COMPENSATION OF MEMBERS.—Each member of the legislature shall receive for his services five dollars for each day's attendance during the session, and ten cents for every mile he shall travel in going to and returning from the place of meeting of the legislature, on the most usual route."

"EXTRA COMPENSATION PROHIBITED.—The legislature shall never grant any extra compensation to any public officer, agent, servant, or contractor after the services shall have been rendered or the contract entered into, nor shall the compensation of any public officer be increased or diminished during his term of office." Art. II, § 25.

"LIMITATION ON AMENDMENTS.—No amendment to any bill shall be allowed which shall change the scope and object of the bill." Art. II, § 38.

Art. III, § 12, provides:

"Every act which shall have passed the legislature shall be, before it becomes a law, presented to the governor."

The balance of the section states in detail the method in which the governor shall act, and the manner in which the legislature may, if it so desires, overrule the governor.

"ART. VIII, § 4. NO MONEYS SHALL EVER BE PAID OUT OF THE TREASURY OF THIS STATE, OR ANY OF ITS FUNDS, OR ANY OF THE FUNDS UNDER ITS MANAGEMENT, EXCEPT IN PURSUANCE OF AN APPROPRIATION BY LAW; NOR UNLESS SUCH PAYMENT BE MADE WITHIN ONE CALENDAR MONTH AFTER THE END OF THE NEXT ENSUING FISCAL BIENNIUM, AND EVERY SUCH LAW MAKING A NEW APPROPRIATION, OR CONTINUING OR REVIVING AN APPROPRIATION, SHALL DISTINCTLY SPECIFY THE SUM APPROPRIATED, AND THE OBJECT TO WHICH IT IS TO BE APPLIED, AND IT SHALL NOT BE SUFFICIENT FOR SUCH LAW TO REFER TO ANY OTHER LAW TO FIX SUCH SUM." Amendment 11. (Emphasis mine.)

"The style of the laws of the state shall be: 'Be it enacted by the legislature of the state of Washington;' and *no laws*

*shall be enacted except by bill."* Art. II, § 18. (Italics mine.)

The action of the legislature, as approved by the majority opinion, violates every principle of government based upon the theory of co-ordinated departments. The reason is that it makes of the Senate and House of Representatives an exclusive organization, and gives it power to formulate and put into execution any policy desired, this without regard, as I shall demonstrate later, to the wishes of the governor, or of the people. Bear in mind that the majority opinion holds that house concurrent resolution No. 10 is an *act* of the legislature. In other words, the majority opinion approves as law, concurrent resolutions. I maintain that a resolution is not an act or a law, and that state funds cannot be disbursed by virtue of its provisions.

I view the case of *State ex rel. Mullen v. Howell,* 107 Wash. 167, 181 Pac. 920, in a different manner than the majority. In my opinion, the question in that case was, whether the initiative provision of our constitution was broad enough to allow the people to review an action of the legislature which was. not a law. My conclusion is borne out by the following excerpt from the opinion:

"This amendment was submitted to, and ratified by, the legislature of the state of Washington by joint resolution passed January 13, 1919. On March 20, 1919, relator tendered a petition for a referendum to the respondent secretary of state; he asked that it be filed and a ballot title be supplied. Respondent refused to receive it upon the grounds, (a) that the amendment, having been adopted by a joint resolution and not by an act, bill or law, was not within the terms of the seventh amendment; and (b) that it was not a subject for referendum under article V of the constitution of the United States.

"Addressing ourselves to the first contention of the respondent, Is the resolution an act, bill or law, within the meaning of those terms as employed in our constitution; whether the people intended an act, bill, or law to be statutes enacted by the legislature, or whether they meant *action* by the legislature which affected them as law?" (Italics mine.)

And this court indicated the scope of its investigation by saying:

"It is well known that the power of the referendum was asserted, not because the people had a willful or perverse desire to exercise the legislative function directly, but because they had become impressed with a profound conviction that the legislature had ceased to be responsive to the popular will. They endeavored to, and did—unless we attach ourselves to words and words alone, reject the idea upon which the referendum is founded, and blind ourselves to the great political movement that culminated in the seventh amendment—make reservation of the power to refer every act of the legislature with only certain enumerated exceptions.

"Guided by these considerations, we are satisfied that the people used the words 'act, bill or law' in no restricted sense, but in a sense commensurate with the political evil they sought to cure.

"And why should not the amendment be a law within the meaning of the seventh amendment? No reason is assigned other than that 'law' as there used is synonymous with 'bill' or 'act.' We may well argue and be within sound rules that, if the people had so intended, they would not have used the word 'law' at all, as was done in the state of Oregon. We can conceive of no more sweeping law than the proposed amendment. Certainly no amendment has ever been proposed that goes deeper into the vitals of the American idea of government. It surrenders *pro tanto* the sovereignty of the state, gives to the Federal government a right to enact laws and to enforce them through the Federal courts, and it will deny the citizen the protection of some of those guarantees that we have written out of the travail of time into our own Bill of Rights. Upon construction, we hold that the amendment to the constitution of the United States is a law within the meaning of the seventh amendment, and is subject to referendum."

This court then considered the cases of *Boyers v. Crane,* 1 W. Va. 176, *State ex rel. Attorney General v. Kinney,* 56 Ohio St. 721, 47 N. E. 569, and *Barry v. Viall,* 12 R. I. 18, which held that a legislature cannot give a matter the force and effect of law by passing resolutions, and that the statute law of the state cannot be repealed or amended by joint resolutions of the general assembly.

Speaking of the rules announced in the above decisions, this court stated:

"And were we considering a matter involving private right arising in or out of the laws of this state, we could not question the authorities just cited; but they are not applicable for the reason that the authority to act in the matter of a proposed amendment to the constitution of the United States does not arise in or out of the constitution of the state, but arises out of the Federal constitution, and any act, whether it be by resolution or by bill, on the part of the state legislature must be held to be a sufficient expression of the legislative will unless Congress itself challenges the method or manner of its adoption."

It is crystal clear that the above opinion did not confirm resolutions, or acts or laws as usually understood, but simply held that the *actions* of the legislature, except those relating to emergency acts, were subject to referendum.

Another defect in the procedure taken by the legislature is that it violated the constitutional provision giving the governor the power of veto. This provision relative to the power of veto given to the governor, is a valuable one. It should be given the same consideration as any other portion of our constitution.

"In approving and disapproving laws, in the exercise of his constitutional prerogative, the executive is a component part of the legislature." *Spokane Grain & Fuel Co. v. Lyttaker,* 59 Wash. 76, 109 Pac. 316.

"In the first place, and to clear away immaterial matters, it should be said that the governor's veto of parts of the measure now means nothing whatsoever. In exercising the veto power, the governor acts as a part of the legislative bodies, and the act is to be considered now just as it would have been if the vetoed provisions had never been written into the bill at any stage of the proceedings." *State ex rel. Stiner v. Yelle,* 174 Wash. 402, 25 P. (2d) 91.

"When referring to what the legislature intended, we must not forget that the governor, when acting upon bills passed by both houses of the legislature, is a part of the legislature, and acting in a legislative capacity, and we cannot therefore consider the intent of the house and the senate apart from the intent of the governor." *Shelton Hotel Co., Inc. v. Bates,* 4 Wn. (2d) 498, 104 P. (2d) 478.

In *Lynch v. Department of Labor & Industries,* 19 Wn. (2d) 802, 145 P. (2d) 265, this court had before it a question dealing with whether a statute, which sought to give to widows of deceased workmen who had been engaged in extrahazardous occupations an additional widow's allowance, was retrospective. In that case, it was necessary to ascertain the legislative intent in passing the act. In doing so, we considered the history of the act, traced its legislative travels, and then stated:

"The attorney general is the legal adviser of the governor and other state officers. Washington Constitution, Art. III, § 21; Rem. Rev. Stat., § 11032 [P. C. § 6574-14]. It is reasonable to assume, under the circumstances here shown, that in approving the bill the governor acted upon the advice which he had sought and obtained from the attorney general. If he had exercised his power of veto, the bill would of course not have become a law. In so considering and approving the bill, the governor acted in his legislative capacity."

Resolution No. 10 was fatally defective in that it was not referred to the governor of the state of Washington for his consideration as provided by our constitution. The legislative procedure was not complete, hence invalid.

The resolution cannot be considered as a completed act, or bill, or law, for another reason, and that is that it did not have a title as required by Art. II, § 19. This section has been considered by this court in over fifty cases, which, of course, I cannot consider in this dissent, except to say that in each and every one of them there is a definite holding that there must be a title which indicates the subject considered in the body of the act. For a complete discussion of this subject, and the necessity of having a valid title, I refer to *Petroleum Lease Properties Co. v. Huse,* 195 Wash. 254, 80 P. (2d) 774. Admitting for the purpose of argument that the resolution was an enforcible act or law, it still remains that it is void because it did not have a title which expressed the subject matter of the resolution.

Another fatal defect is that state funds may not be appropriated or spent, except by an *"appropriation by law."* A

resolution is not an act, or law, or statute. Generally speaking, resolutions of legislative bodies are used for the purpose of: (1) expressing opinion or sentiment; (2) to carry out the inner administration of the legislative body; and, (3) to establish procedure for constitutional amendments. Passing upon this subject, this court said in *State ex rel. Todd v. Yelle*, 7 Wn. (2d) 443, 110 P. (2d) 162:

"It is equally clear that a house resolution is not a law. A law must be enacted either by popular initiative or by the legislature, and, when enacted by the legislature, must be by bill (Const., Art. II, § 18), and a bill cannot become a law until it is enacted by both houses (Art. II, § 22) and approved by the governor, or repassed over his veto (Art. III, § 12). Section 18 of Art. II of the constitution reads as follows:

" '§ 18. The style of the laws of the state shall be: "Be it enacted by the legislature of the state of Washington;" *and no laws shall be enacted except by bill.*' (Italics ours.)

"This section alone necessitated the result arrived at in the *Banker* case, and the result would have been completely justified by merely citing it, had the court preferred to summarily dispose of the matter.

"The court might also have summarily disposed of the matter by pointing out that the resolution, upon which the relator founded his claim to the writ prayed for, attempted to carve out of the general appropriation made by the legislature for the expenses of that legislative session, five dollars per day, *not* for the expenses of the members of the legislature, but for the expenses of the members of the house of representatives only. This attempted diversion of funds was so plainly illegal that the court might well have found, without further consideration, that the relator could claim no legal right by virtue of the resolution."

Following are examples of resolutions held void as attempts at general legislation:

Appointments of committees to continue beyond session of the legislature. *Dickinson v. Johnson*, 117 Ark. 582, 176 S. W. 116, Ann. Cas. 1916B, 1067, L. R. A. 1915E, 496; *Gilbreath v. Willett*, 148 Tenn. 92, 251 S. W. 910, 28 A. L. R. 1147;

Employment of agents to present state claims against the United States. *Mullan v. State,* 114 Cal. 578, 46 Pac. 670, 34 L. R. A. 262;

Making appropriations. *Henderson v. Collier & C. Lith. Co.,* 2 Colo. App. 251, 30 Pac. 40; *Matter of Moran v. La-Guardia,* 270 N. Y. 450, 1 N. E. (2d) 961, 104 A. L. R. 1160; *Collier & C. Lith. Co. v. Henderson,* 18 Colo. 259, 32 Pac. 417; *In re Advisory Opinion to Governor,* 43 Fla. 305, 31 So. 348; *Advisory Opinion to the Governor,* 156 Fla. 45, 22 So. (2d) 397.

The last case cited is of special importance. Art. IX, § 4, of the constitution of Florida provides that, "no money shall be drawn from the treasury except in pursuance of appropriation made by law." In 1943, the Florida legislature passed an act (F.S.A. § 11.12), which was in the following terms:

"(1) The state treasurer is authorized to pay the per diem, mileage and expenses of the members of the legislature, together with such expenses of the legislature as the same accrue, and the per diem of employees of the senate and the house of representatives as the same accrues, also such expenses of the legislature as shall be authorized by a resolution of either house, upon the presentation to the state treasurer of an order of the comptroller, countersigned by the governor, for the stated amount, which order shall, at the close of the legislative session or in due course, be presented to the comptroller, who shall issue to the state treasurer a warrant or warrants therefor.

"(2) The sum of three hundred thousand dollars biennially, or so much thereof as is necessary, is appropriated out of the general revenue fund, out of the moneys not otherwise appropriated, to carry out and cover the expenditures provided under this section, and the same is made available as needed at any time during the session of the legislature."

Thereafter the legislature passed a resolution which directed payment of expenses of an interim committee on commerce and reciprocal trade out of the amount of money provided for legislative expenses. The supreme court of Florida said:

"The subject matter of this letter, Resolution No. 17, 1945 session, is to be differentiated from House Resolution No. 27

because House Resolution No. 17, supra, shows on its face that it is proposed to pay the expenses of a legislative committee, the activities of which were performed and are to be performed outside the legislative session.

"We are, therefore, of the opinion that the items suggested by Resolution No. 17 are not such as to be payable as a part of the legislative expense and that the purpose of the resolution may only be accomplished by a statute duly enacted by the Legislature making the appropriation for the payment of the items contemplated in this resolution."

Even in a jurisdiction where the governor has the veto power over joint resolutions, it has been held that:

"With respect to the appropriation made by the resolution. In the light of the provisions of the Constitution, and the authorities cited in relation thereto, an appropriation cannot be made otherwise than by a bill. It must be enacted as a law and any attempt to make an appropriation otherwise than provided in our constitution is a violation thereof and such action is a nullity." *Scudder v. Smith,* 45 Dauph. Co. Rep. 209.

This case was appealed to the supreme court of Pennsylvania, which affirmed the decision of the lower court in the following language:

"The fact that the joint resolution went through the *mode of passage* prescribed by the Constitution for bills, does not supply the constitutional deficiencies of its conception. The purpose of the constitutional requirements relating to the enactment of *laws* was to put the members of the Assembly and *others interested, on notice,* by the title of the measure submitted, so that they might vote on it with circumspection. What was attempted to be done by the sponsers of this challenged measure was something utterly alien to the proper subject matter of a 'joint resolution.' Its deceptive nomenclature is fatal to its validity as a *law.* [The court's italics.]" *Scudder v. Smith,* 331 Pa. 165, 200 Atl. 601.

In view of these decisions, and the definite provisions of the constitution, I can see no escape from the conclusion that public funds cannot be expended by virtue of a resolution.

But, it is argued that the appropriation was made by law at the time chapter 1, Laws of 1947 (the legislative expense

bill), was passed, and that therefore the money was subject to disposition by Senate and House resolution. This argument cannot withstand the constitutional provision that appropriations must be made by law, which distinctly specifies the objects to which the appropriation is to be applied. Further, that act of appropriation cannot refer to any other law to fix the sum. Chapter 1 did not directly or indirectly refer to, or indicate that any portion of the $475,000 should be spent for, the expenses of interim committees.

Transfers of appropriated funds, such as made here, have in this state been prohibited.

In 1922, this court had before it the case of *State ex rel. Bloedel-Donavan Lbr. Mills v. Clausen,* 122 Wash. 531, 211 Pac. 281. In that case, a writ of mandate was sought to compel the transfer of a sum of money from the general fund to the accident fund created by the workmen's compensation act. The general appropriation laws of 1921 appropriated a sum of $506,147 from the general fund for the purpose of paying for the operation of the department of labor and industries. At the same time, $215,535 was appropriated from the accident fund for the administrative expenses of the department of labor and industries. After the appropriations were available, warrants were drawn upon the accident fund in an amount which exhausted the fund appropriated by the legislature. It was sought by the mandamus action to compel a transfer, from the general fund to the accident fund, of an amount sufficient to reimburse that fund. In passing, this court held:

"Unless, then, it was the duty of the respondents [state auditor and state treasurer] to make the transfer sought in this action, the writ cannot be issued by the court directing them to do so. No statute has been called to our attention which imposes any such duty upon the respondents. The legislative expression is to the contrary; to cover the administrative expenses, one appropriation was made from the general fund and the other from the accident fund."

We quoted Art. VIII, § 4, of the state constitution, and then said:

"Under this provision, no moneys can be paid out of the state treasury, or any of its funds, except in pursuance of

an appropriation by law, and such law must distinctly specify the sum appropriated and the object to which it is to be applied. The money in the general fund appropriated for the administrative expenses was not by the legislature appropriated for the purpose of replenishing the industrial fund, even though the expenditures from that fund may have been illegally made. The relators, in the affidavit supporting the application, state that unless the respondents are required to transfer the $215,535 from the general fund to the accident fund, they, as employers of men engaged in extra-hazardous employment, 'will be required and compelled to pay into the said accident fund, as premiums, assessments and contributions, a large sum in excess of the amount necessary and proper to make good the legitimate depletion and drain upon said accident fund from the payment of accident claims and other proper and lawful disbursements, exclusive of the expense of administration.' It therefore plainly appears that, if the transfer was made, it would be into a fund not authorized by the legislature and for an object not specified in the appropriation act. It is not a sufficient answer to this to say it would only in effect compensate the relators for money which they had paid into the accident fund and which had been wrongfully paid out. The purpose of the transfer, if made at this time, would operate to decrease the sum which the relators would be required to pay into the accident fund in the future as premiums and assessments."

This rule was followed in *State ex rel. Shuff v. Clausen,* 131 Wash. 119, 229 Pac. 5.

Another reason for holding that the resolution does not have the force and effect of law is that it has no enacting clause as provided in Art. II, § 18, and because such section also prohibits the passage of acts or bills by resolution by stating that no law shall be enacted except by bill.

As I view the situation, the majority opinion gives the legislature unrestricted control over funds originally appropriated by statute duly passed by both Houses and signed by the governor.

In this case, the appropriation for legislative expenses was in the amount of $475,000. It was declared to be an emergency, as it surely was, and the governor signed it. Then the amount was made available for the stated purpose

of meeting the legislative expenses of the thirtieth legislature. The legislative expenses were $245,068.51. The committee created by resolution No. 10 spent to February 1, 1948, the sum of $49,502.42. Other interim committees expended $12,648.32, leaving a balance of $167,780.75. Legislative expenses, according to the majority, are still accruing.

I will give another illustration to show what legislatures in the future may do. Let us assume that a legislature will pass a bill providing for large expenditures for the purpose of building highways. An emergency clause will be attached, the governor will be satisfied of the merits of the bill, and sign it. The people will favor the expenditure for the purpose mentioned in the act, and will not seek referendum. Then just before adjournment, the legislature can pass a resolution, such as we have here, and defeat the purposes in whole, or in part, of the act. It may be argued, however, that the people will challenge the resolution by referendum. The answer is, as pointed out by Judge Schwellenbach, the people tried to do that with the present resolution No. 10, and this court refused to compel the secretary of state to accept the filing of the referendum petition.

The writ should not issue.

MALLERY, C. J., and SCHWELLENBACH, J., concur with SIMPSON, J.

---

May 14, 1948. Petition for rehearing denied.